## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **vs.** | ) | **PRESENTENCE INVESTIGATION REPORT** |
| | ) | |
| **Salvatore Mancuso-Gomez** | ) | **DOCKET NO.: 1:02CR00388-002 (SEALED)** |

---

**Prepared For:**     Ellen S. Huvelle
                      United States District Judge

**Prepared By:**      Michael Penders
                      United States Probation Officer
                      (202) 565-1379

| **Prosecuting Attorney** | **Co-Defense Counsel** | **Co-Defense Counsel** |
|---|---|---|
| Joshua P. Jones | H. Heather Shaner | Joaquin G. Perez |
| 1400 New York Avenue, NW | 1702 S Street, NW | *Pro Hac Vice* |
| Washington, DC 20005 | Washington, DC 20009 | 6780 Coral Way |
| (202) 353-3832 | (202) 265-8210 | Suite #200 |
| josh.jones@usdoj.gov | hhsesq@aol.com | Miami, Florida 33155 |
| | | (305) 261-4000 |
| | | jplaw1@bellsouth.net |

**Sentence Date:**     Not set

**Offense:**     Count 1:     Conspiracy to Manufacture and Distribute Five
                              Kilograms or More of Cocaine, Intending and Knowing
                              that the Cocaine will be Imported into the United States
                              and Aiding and Abetting
                              21 USC §§ 960, 952, and 959 and 18 USC § 2
                              10 years to Life Imprisonment/$4,000,000 fine

**Release Status:**     Held without bond in the United States since 05/14/2008.

**Detainer:**     None

**Codefendants:**     Yes

**Related Cases:**     None

**Date Prepared:**     08/24/2010          **Date Revised:**     03/26/2012

**MANCUSO-GOMEZ, Salvatore**                                      **Page 2**

**Identifying Data**

| | |
|---|---|
| **Legal Name:** | Salvatore Mancuso-Gomez |
| **Date of Birth:** | 08/17/1964 |
| **Age:** | 46 |
| **Race:** | White/Hispanic |
| **Sex:** | Male |



**PACTS# 22503**

| | |
|---|---|
| **SSN:** | N/A |
| **FBI No.:** | 707460WC9 |
| **U.S. Marshal No.:** | 29359-016 |
| **Other ID No.:** | DCDC# 318-930 |

**Marital Status:**   Married

**Education:**    Bachelor's Degree
**Dependents:**   0[1]
**Citizenship:**   Republic of Colombia and Italian Republic

**Legal Address:**   No Fixed Address

**Telephone #:**   None

**Aliases:**    "El Mono" and Santander Lozada

**Restrictions on Use and Redisclosure of Presentence Investigation Report.** Disclosure of this presentence investigation report to the Federal Bureau of Prisons and redisclosure by the Bureau of Prisons is authorized by the United States District Court solely to assist administering the offender's prison sentence (i.e., classification, designation, programming, sentence calculation, pre-release planning, escape apprehension, prison disturbance response, sentence commutation, or pardon) and other limited purposes, including deportation proceedings and federal investigations directly related to terrorist activities. If this presentence investigation report is redisclosed by the Federal Bureau of Prisons upon completion of its sentence administration function, the report must be returned to the Federal Bureau of Prisons or destroyed. It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the presentence investigation report is prohibited without the consent of the sentencing judge.

---

[1]Based on IRS Publication 501 definition for dependent(s) to include qualifying child or relative. All identified children, whether or not a dependent of the defendant, are included in Part C of this report.

## PART A. THE OFFENSE

### Charge(s) and Conviction(s)

1.   On 09/17/2002, a Grand Jury in the District of Columbia returned a four-count Indictment charging the defendant, Salvatore Mancuso-Gomez and two co-defendants: Carlos Castano-Gil and Juan Carlos Sierra-Ramirez with the following: (Ct. 1) Conspiracy to Import and to Manufacture and Distribute Five Kilograms or More of Cocaine Intending and Knowing that the Cocaine will be Imported into the United States and Aiding and Abetting, in violation of 21 USC §§ 960, 952 and 959; and 18 USC § 2; (Ct. 2) Manufacture and Distribution of Five Kilograms or More of Cocaine Intending the Importation into the United States, in violation of 21 USC § 959 and 18 USC §2; (Ct. 3) Conspiracy to Possess with Intent to Distribute Five Kilograms or More of Cocaine on Board a Vessel Subject to the Jurisdiction of the United States and Aiding and Abetting, in violation of 46 USC § 1903(a) and (j); and 18 USC § 2; and (Ct. 4) Possession with Intent to Distribute Five Kilograms or More of Cocaine on Board a Vessel Subject to the Jurisdiction of the United States and Aiding and Abetting, in violation of 21 USC § 853 and 970; 46 USC § 1903; and 18 USC § 2.

2.   The defendant, Salvatore Mancuso-Gomez, is specifically named in Count 1 of the Indictment; co-defendant Castano Gil is named in all four Counts, and co-defendant Sierra-Ramirez is named in Counts 1, 3, and 4.  The conduct for Count 1 commenced January 1997 and ended on 09/17/2002.

3.   The Indictment provides notice to the defendant the Government intends to seek forfeiture as a part of the sentence. Rule 32.2(a) of the Fed. Rules of Crim Proc.

4.   On 11/19/2008, the defendant pled guilty to Count 1 of the Indictment. According to his plea agreement, the defendant agreed the conviction exposed him to not less than ten years nor more than Life[2] imprisonment, at least five years supervised release, a fine of not more than $4,000,000, and a special assessment of $100. The agreed he was accountable for more than 150 kilograms of cocaine, agreed he was an organizer or leader of a criminal enterprise, agreed that he shall receive a one lever increase under USSG §2D1.1, comment.(n.16) as the amount of cocaine involved is extraordinary, and that he should receive a two level increase for possessing a firearm.

---

[2]Although the sentencing range includes a period of incarceration up to life, the government is prohibited from seeking a life sentence. Prior to extradition of the defendant to the United States from Colombia, the United States government made assurances with the Colombian government that the United States would not seek the death penalty or life imprisonment if the defendant was convicted. This assurance is made for all defendants extradited from Colombia to the United States.

5.      Mr. Mancuso-Gomez has been in custody of the United States since 05/14/2008. On 07/01/2004, the defendant turned himself into Colombian authorities under the Justice and Peace Act and was confined to a "concentration area" in Colombia from 07/01/2004 until his extradition to the United States. The parties to the plea agreement agreed to provide the defendant with credit for time served from 08/16/2006 until 05/14/2008 while he was held in custody in Colombia.

6.      Carlos Castano-Gil (1:02cr388-01) was killed in Colombia prior to his arrest in response to this Indictment, and Juan Carlos Sierra-Ramirez (1:02cr388-03) has entered a plea of guilty to Count 1, but has yet to be sentenced.

**The Offense Conduct**

7.      In approximately 1997, the *Autodefenses Unidas de Colombia* ("AUC") began as a right-wing paramilitary group operating in Colombia. The stated objective of the AUC was to defeat the *Fuerzas Armadas Revolucionarias de Colombia* ("FARC") and *Ejercito de Liberacion National* ("ELN") left wing rebel guerilla groups that controlled large portions of Colombia. The AUC primarily financed its military operations against the FARC and ELN and enriched its leaders by producing, selling, and distributing cocaine. The AUC was structured as a military organization with approximately 30,000 armed soldiers organized into blockds or regions with commanders for each area. Ultimately, the AUC evolved into a narco-terrorist organization to further its political objectives.

8.      On 09/04/2002, the commanders of the "former" AUC met for several days and the AUC was reformed. Co-defendant Carlos Castano-Gil ("Castano"), co-defendant Slavatore Mancuso-Gomez ("Mancuso"), Ramon Isaza and Vicente Castano were installed as the leaders of the "new" AUC. The organization was structured as follows: (DIPOM Direccion Politica y Militar) Carlos Castano - Vicente Castano - Salvatore Mancuso - Ramon Isaza; (ESTADO MAYOR) Jorge Cuarenta, Alfredo Berrio Aleman, Pedro Ponte, Hernan Hernandez, Adolfo Paz, Ramiro Vanoy Cuco, Francisco Garcia Paisano, Eduardo Cifuentes Aguila, Victor Triana Botalon, Martin Emilio, Daniel Roa, Francisco Tabares; (AUTODEFENSES de la SIERRA) Herman Giraldo; (AUTODEFENSES del SUR del CESAR) Franciso Tabares, Alejandro; (AUTODEFENSES CAMPESINAS de CORDOBA y URABA) Salvatore Mancuso; (AUTODEFENSES del TOLIMA) Daniel Roa, Martin Emilio; (AUTODEFENSES de PTO BOYACA) Victor Triana Botalon; (AUTODEFENSES de RAMON ISAZA) Ramon Isaza, Maguiver, Roque; (AUTODEFENSES de CUNDINAMARCA) Eduardo Cifuentes Aguila.

9.      The conspiracy in this case involved the importation of cocaine into the United States by AUC leaders Castano and Mancuso and AUC member, and co-defendant Juan Carlos Sierra-Ramirez. Castano was the leader and director of operations for the drug trafficking organization. The AUC established cocaine prices and used the AUC military forces to protect cocaine laboratories, maintain cocaine base markets, mediate disputes between drug distributors, and protect drug trafficking operations.

10.     The defendant, Mancuso, was a high ranking member of the organization and used his position in the AUC to manage the operations of the drug trafficking organization including production, distribution, and transportation operations. In addition, Mancuso was the leader of an AUC controlled area in Colombia called "Cordoba". From this designated region alone, cocaine was produced at a rate of approximately 2,000 kilograms per month over the course of the conspiracy for a total of 138,000 kilograms. This estimate is based upon information gathered from law enforcement and confidential sources, seizures of cocaine in the region and the location, inspection and destruction of cocaine laboratories in the Cordoba area. The vast majority of cocaine produced in the Cordoba area was transported to the coastal areas of Colombia and ultimately smuggled into the United States.

11.     Sierra-Ramirez was the organizer of large transportation operations for AUC members which involved worldwide shipments of cocaine by aircraft, freighters, and speed boats. He directly coordinated two large shipments of cocaine destine for Europe that were seized by law enforcement authorities.

12.     More specifically, the evidence in this case would establish that cocaine base was sold and cocaine was produced in laboratories controlled and protected by the AUC troops under the direction and control of co-defendants Castano and Mancuso. Cocaine sold or distributed by the AUC was transported under the security of AUC troops to the coast of Colombia and loaded onto ships or aircraft for transport to the United States and Europe. "Go-fast" boats - - small vessels rigged with extra motors and fuel - - were used to transport the cocaine from Colombia to trans-shipment points in Central America, Jamaica, Haiti, and the Dominican Republic for import to various regions along the borders of the United States.

13.     AUC operations was controlled and directed by Castano and enforcement of AUS rules on Colombian citizens was harsh. The evidence in this case would show that during July of 1998, Castano, with approximately 200 armed AUC troops, arrived at the town of San Pablo, Bolivar, Colombia, where approximately 500 cocaine base buyers and sellers assembled. A speaker for the AUC announced that "counterfeit" cocaine would not be tolerated as AUC troops took 10 individuals from the crowd that the AUC suspected of selling "counterfeit" cocaine for execution. Castano himself addressed the crowd for an hour to set the cocaine base prices, the quality of cocaine base sold and the fees to be paid to the AUC for cocaine base production and transportation. In addition, Castano ordered that the production of cocaine hydrochloride from the cocaine base was to be in conversion laboratories located in the AUC area (i.e. the Magdelena block) and the local AUC commander would purchase, in United States dollars, all of the cocaine hydrochloride produced at the AUC established price.

14.     In May 1998, Mobile, Alabama, United States Customs Service ("Customs") Special Agent James Tanner ("S/A" Tanner") had a confidential source ("CS") that was approached by Juan Forte in Miami, Florida. Forte was looking for transportation for a shipment of cocaine from Colombia to the United States and wanted to introduce the CS

to a member of the AUC, Jose Danilo Triana. The CS set up a meeting for July 1998 in Louisiana between S/A Tanner who was working undercover and the targets Forte and Triana. Triana flew from Colombia to the US to attend the meeting. At the meeting S/A Tanner gave Forte and Triana a tour of a shrimp boat used for undercover operations and said the he would need $40,000 in advance for the transportation operation which was to involve the importation of 300 to 500 kilograms of cocaine.

15.    On 10/21/1998, S/A Tanner and the CS flew to New York and met with a representative of the AUC. There they received $39,500 for expenses to send the boat. In November 1998, Customs sent an undercover supply vessel off the coast of Colombia to take delivery of the cocaine shipment. No one showed up to deliver the cocaine at sea, and the undercover supply vessel returned.

16.    S/A Tanner continued to negotiate with Triana who was in Colombia to resolve the issues in the shipment. On 03/05/1999, S/A Tanner flew to New York and met with a Colombian nicknamed "the engineer."  "The engineer" gave S/A Tanner $20,000 for expenses for the next trip. On 03/27/1999, S/A Tanner traveled again to New York and a Colombia woman named Luz Maria gave him an additional $29,000 for expenses.

17.    On 04/08/1999 the undercover supply vessel again left for the coast of Colombia to pick up the shipment of cocaine. Just after departure S/A Tanner received a call from the AUC targets who said to turn around because there were problems in Colombia. There were several more weather delays between that date and 01/04/2000.

18.    On 01/04/2000, Triana traveled from Colombia to Mobile, Alabama and met S/A Turner. During the meeting they discussed the details of the transportation of the cocaine from the coast of Colombia to the United States and the codes and frequencies to be used. Triana wanted to know more about the highway escape routes that could be used after he received delivery of the shipment in the United States from the undercover vessel. Triana flew back to Colombia to obtain delivery of the cocaine. On 01/14/2000, the undercover vessel left for the coast of Colombia to meet with the Colombian traffickers. After some rough weather the undercover vessel was in place on 01/24/2000 off the coast of Colombia. That day, Triana met with Castano in the AUC controlled area around the Sierra Nevada mountains while picking up the cocaine. On the morning of 01/25/2000, the Colombians delivered 300 kilograms of cocaine to the undercover vessel. The offload only took minutes but was preserved on videotape. The objective was then to deliver the cocaine to the targets in the United States and arrest them at the delivery point.

19.    On 02/07/2000, S/A Tanner met with Triana and Forte in the parking lot of the K-Mart in Mobile, Alabama. During this meeting, captured on audio tape, Triana said that the deal had to work because the cocaine was sold by Castano, the "Jefe of the Autodefensas", whom he met while completing the drug deal. On 02/08/2000, part of the 300 kilograms of cocaine was delivered by undercover Customs Agents to a waiting tractor trailer truck in Mobile, Alabama and several individuals were arrested by Customs and DEA Agents including Forte and Triana.

20.     The evidence would show that there were seven cocaine loads between 500 to 1,000 kilograms from the Cordoba area that Mancuso controlled. The cocaine was shipped under the protection of AUC soldiers to the coast of Colombia and loaded on "go-fast" boats for transport to Central America, Jamaica, Haiti, and the Dominican Republic before shipment to various border regions of the United States. These shipments were as follows:

> 03/19/1999: Defendant and Castano sold 1,000 kilograms of cocaine for transport to the United States. The cocaine was transported to a beach in northern Colombia by AUC soldiers in trucks with hidden compartments. The defendant himself carefully counted the number of kilograms, explaining that the "go-fast" vessels were to meet a merchant ship that could only store 1,000 kilograms in hidden compartments. The transporter was told he would only be paid for transportation costs and was not to transport any additional cocaine with this shipment.

> 08/04/1999: 500 kilograms of cocaine were received from the Defendant and Castano and were transported in the same manner to the United States as the previous 1,000 kilograms in March.

> 11/23/1999: 500 kilograms of cocaine were sold in the same fashion but while in transit to Jamaica the crew threw the cocaine overboard when they came in close contact with a United States Coast Guard vessel. The crew and ship were able to evade capture but the 500 kilograms of cocaine were lost. The United States Coast Guard recovered 350 kilograms of cocaine from the sea.

> 01/16/2000: 500 kilograms of cocaine were sold by the defendant and successfully transported by "go-fast" vessel to Haiti in route to the United States.

> 03/04/2000: 500 kilograms of cocaine were sold by the defendant and successfully transported by "go-fast" vessel to Haiti in route to the United States.

> 06/20/2000: 600 kilograms of cocaine were received from the defendant and successfully transported to the Dominican Republic in route to the United States.

> 09/12/2000: 814 kilograms of cocaine were sold by the defendant and successfully transported by a "go-fast" vessel from Colombia to Jamaica to the Bahamas. While being smuggled into the United States from the Bahamas, however, this load of cocaine was stolen. The defendant personally contacted the two transporters and insisted upon a payment of one million United States dollars for the loss.

21.     On live Colombian television Castano was interviewed by reporter Dario Arizmendi and the following is an excerpt from that interview:

| | |
|---|---|
| Arizmendi: | What the guerrilla calls the gram tax? |
| Castano: | Yes, so 1,000 kilograms of leaves are taken. They have to pay. I don't know the amounts. That is managed by the Northern front. There isn't a cocaine laboratory, we aren't cocaine exporters. I mean, we're not drug traffickers. But, to try and ignore that the Colombian conflict and the drug traffic feed each other would be a fallacy. |
| Arizmendi: | What percentage of the financing of the self-defense forces can come from ranchers and farmers that are dedicated to drug trafficking? |
| Castano: | I'm saying....I'm not saying that farmers and ranchers perpetuate drug trafficking. To me the drug trafficker is one and the farmer and the rancher is another. About the drug trafficking, the drug trafficking should finance 70 percent, like in the guerrilla some 90, more or less, between abduction and drug traffic. |

22.     In a television interview by RCN News on 08/09/2000, Castano was interviewed and noted the following:

| | |
|---|---|
| Interviewer: | Would you be able to tell the country how much money, in concept, the AUC takes in through the chain of drug trafficking? |
| Castano: | It's very difficult to manage but I will mention the figures Agabarra and San Lucas were 600 million worth of taxes charged to the coca growers. The finances that cover these two fronts there have to cover the entire Northern Block of the AUC. This doesn't make me a drug trafficker. By no means. I set an interesting example for the country. |

23.     The defendant was interviewed on a program called La Noche airing on RCN Television News Colombia on 08/04/2003. During that program, the defendant responded to a question concerning "taxation" of coca by noting that "we collect taxes from different regions of Colombia." During 2004, on a Public Broadcasting Service special called "Wide Angel," the defendant admitted that the AUC receives 70% of its money from taxing drug traffickers.

24.     In December 2002, the defendant began his participation in what was to be the Justice and Peace process, a program designed to have AUC members voluntarily surrender their arms and truthfully disclose their criminal activity. During this process, the defendant has admitted to involvement in the murders of "military targets," mayors, drug traffickers, and peasants. Included in this admission is the February 2000 AUC massacre of forty-

two (42) people in the El Salado neighborhood of the Las Ovejas Bolivar region of Colombia. Evidence discovered by the Colombian government suggest that the defendant's estimate may have been mistaken. The actual number of individuals killed and tortured by AUC members may be as many as one hundred civilians.

25. In addition to this admission, the evidence will show AUC paramilitary troops committed 15 massacres, killing a total of 145 individuals during May 29 through September 1, 1999 in the area of Vetas, Norte de Santander and in and around La Gabarra and Tibu. In addition, AUC paramilitary troops committed a massacre of 27 people in Chengue, Sucre region on 01/17/2001. As Castano admitted on RCN News show La Noche on 08/09/2000, in response to a question regarding the AUC being listed as a terrorist organization by the United States, "there have been excesses" and asked forgiveness for the "deplorable events that have occurred that anyone in this right mind would never be able to remotely order."

### Victim Impact

26. Other than general community harm, we have not identified a victim who suffered harm as a result of the defendant's individual conduct.

### Adjustment for Obstruction of Justice

27. The Probation Office has not received any information to suggest the defendant willfully impeded or obstructed the administration of justice during the course of the investigation, prosecution or sentencing of the instant offense of conviction.

### Adjustment for Acceptance of Responsibility

28. During the presentence interview, the defendant agreed with the conduct described in the Statement of Offense as presented to the Court prior to his guilty plea, and under advisement of counsel made no additional statement at that time.

### Offense Level Computation (2011 US Sentencing Guidelines)

29. Count 1 - Conspiracy to Manufacture and Distribute Five Kilograms or More of Cocaine, Intending and Knowing that the Cocaine will be Imported into the United States and Aiding and Abetting, 21 USC §§ 960, 952, and 959 and 18 USC § 2

30. **Base Offense Level:** The defendant is accountable for more than 150 kilograms of cocaine resulting in a base offense level of 38. USSG §2D1.1(a)(5) and (c)(1).          **38**

31. **Specific Offense Characteristic:** A dangerous weapon was possessed during the offense. USSG §2D1.1(b)(1).          **+2**

**MANCUSO-GOMEZ, Salvatore**                                                           **Page 10**

32.   **Victim Related Adjustments:** None                                                  **0**

33.   **Adjustment for Role in the Offense:** The defendant was an organizer or leader       **+4**
      of a criminal activity that was extensive in nature.  USSG §3B1.1(a).

34.   **Adjustment for Obstruction of Justice:**  None.                                      **0**

35.   **Adjusted Offense Level (Subtotal):**                                                 **44**

36.   **Chapter Four Enhancements:**  None.                                                  **0**

37.   **Adjustment for Acceptance of Responsibility:** The defendant demonstrated an         **-3**
      acceptance of responsibility for the offense of conviction and the adjusted offense
      level is decreased two levels. USSG §3E1.1(a). In addition, the defendant assisted
      authorities in the investigation/prosecution of the misconduct by timely notifying
      authorities of his intent to enter a plea of guilty and the government has filed a
      motion or indicated it intends to file a motion acknowledging the defendant's
      actions. As a result, the adjusted offense level is decreased an additional level.
      USSG §3E1.1(b).

38.   **Total Offense Level:**                                                               **41**

## PART B. THE DEFENDANT'S CRIMINAL HISTORY

### Juvenile Adjudication(s)

39.   None known.

### Adult Criminal Conviction(s)

40.   None known.

### Criminal History Computation

41.   The criminal history score is 0, and the criminal history category is I.

## PART C. OFFENDER CHARACTERISTICS[3]

### Personal and Family Data

42.     Salvatore Mancuso Gomez was born in Cordoba Monteria, Republic of Colombia to Salvatore Mancuso D'Angiolella, now 80; and Glady de Jesus Gomez via Diego, now 74. The defendant has three brothers, all of whom reside in Monteria: Giancarlo Mancuso Gomez, age 47; Cesar Fernanco Mancuso Gomez, age 44; and Roberto Mancuso Gomez, age 39. The defendant also has one sister, Rosanna Mancuso Gomez, age 42, who also resides in Monteria where she is a dentist. The defendant's two eldest brothers are involved in business, and his youngest is a rancher. According to Mancuso Gomez, his family is aware he is incarcerated.

43.     The defendant's parents still reside in Monteria where his father owns a dairy ranch. The defendant's father emigrated to Colombia from Italy during World War II escaping fascism and seeking new opportunity. Shortly after arriving in Colombia, the defendant's father worked for an Italian firm involved in the lumber industry. He worked in this capacity for ten years and then started his own business distributing farming equipment (John Deere, Nissan, etc.)  This afforded the defendant and his siblings an upper middle class upbringing in Colombia. His mother was a housewife.

44.     Mancuso Gomez said he was provided with adequate food, shelter and clothing as a child. He recalled his father was a harsh disciplinarian and his mother very affectionate. He was raised in a strict Catholic home where his father would dole out sever punishment with his belt and belt buckle for even minor adolescent indiscretions. Mancuso Gomez said he confronted his father about these punishments when he was twelve years old, telling his father that he was taking the fall for indiscretions of the entire family. He said this had a profound effect on his relationship with his father and the physical abuse subsided.

45.     The defendant indicated he was a national rifle shooting champion in the junior division. He recalled participating in tennis and bicycle racing.  His bicycle racing led him to become a two-time motocross champion in 1982 and 1983 in Colombia.

46.     The defendant is married to Marta Elena Dereix Martinez, who resides in Colombia with two of their three children: John Paul Mancuso Dereix, age 18 a student; and GianLuca Mancuso Dereix, age 15 a student. The defendant and Marta also has a 27-year old son, GianLuigi Mancuso-Dereix who resides in Monteria and is employed in the business administration field. The defendant's oldest son has two daughters.

---

[3]The defendant was interviewed in his native Spanish with the assistance of a certified court Spanish-English interpreter.

47.     Unbeknownst to Marta Elena Dereix Martinez, the defendant has a second wife, Margarita Maria Zapata Gonzalez, whom he married in 2005. The defendant and his second wife have a three year old son in common, Salvatore Mancuso Zapata. Ms. Zapata Gonzalez was last reported to be living in McLean, Virginia, with the couple's son, on a student (F-1) visa while seeking political asylum. The defendant indicated that he did not want to involve Ms. Zapata Gonzalez in his offense and said he has not seen her since his arrest in Colombia.

**Physical Condition**

48.     The defendant is 6 feet 1 inch tall and weighs 200 pounds.  He has brown hair and brown eyes. The defendant has no identifiable marks or tattoos with the exception of a surgical scar on his right ankle.

49.     Mancuso Gomez described his overall health as "ok."  He had surgery on both of his ears in 2004 and 2005, and reports no lingering ill-effects. The defendant injured his right ankle while walking and required corrective surgery.  The defendant said he suffers from arthritis in his joints, but is not currently receiving treatment for his arthritis. He is prescribed medication for high cholesterol.  Mancuso Gomez requires bi-focals, but currently has two separate sets of corrective lenses that are sufficient, yet not ideal, for his needs.

50.     The defendant reported no known allergies to foods or medications.

**Mental and Emotional Health**

51.     The defendant stated he has never suffered from, or been treated for, any mental or emotional health problems. He reported he never sought the professional assistance of a counselor, a psychiatrist, or a psychologist. He was not familiar with any family history of mental illness.

**Substance Abuse**

52.     The defendant reported no history of illicit substance abuse. He said he will occasionally consume alcohol, but does not believe he has any dependency issues.

**Educational and Vocational Skills**

53.     Mancuso Gomez completed his bachelor's degree in Agricultural Administration at ESATEP University in Bogota, Colombia. Prior to receiving his degree in Agricultural Administration, the defendant studied Civil Engineering for seven semesters at Universidad Javeriana in Bogota. He said he did not like the Civil Engineering program but enrolled because his parents wished him to be an engineer.

54.     In 1983, the defendant completed a four month course in English as a second language at the University of Pittsburgh, Pittsburgh, Pennsylvania.

55.     The defendant never served in the Colombian army but indicated that he was recruited by the Colombian Army in the early 1990s to assist with anti-guerrilla intelligence gathering in his hometown. He recalled his involvement in this capacity caused him to make multiple payoffs to both the military and the guerrillas, and caused him to join the AUC in 1991.

### Employment Record

56.     The defendant reported a history of legitimate employment running a farm in Colombia from the early 1980s to 1991. From 1991 to 1995, the defendant was a member of the AUC, and he indicated that from 1995 to 1997, he was in charge of a rice crop in Colombia. From 1997 to 2004, he received a salary as a member of the AUC.

### Financial Condition: Ability to Pay

57.     The defendant did not report having any assets, liabilities, income, or monthly expenses. A check of Lexis/Nexis, a verified source, did not reveal any assets or liabilities associated with Mr. Mancuso-Gomez. He has no credit record in the United States.

58.     Defense counsel is appointed in this case.  The defendant does not appear to have the ability to satisfy a fine in this case.

## PART D. SENTENCING OPTIONS

### Custody

59.   **Statutory Provisions:** The minimum term of imprisonment is 10 years, while the maximum term of imprisonment is life[4] for this Class A felony.   21 USC §§ 963, 960(a)(1), 960(b)(1)(B) and 18 USC § 2.

60.   **Guideline Provisions:** Based on a total offense level of 41 and a criminal history category of I, the guideline range for imprisonment is 324 to 405 months.  USSG Chapter 5, Part A.

### Impact of Plea Agreement

61.   The plea agreement facilitated a three-level reduction for acceptance of responsibility. The agreement also outlined the parties understanding of the defendant's relevant conduct as it applies to the sentencing guidelines, which is congruent with the calculation determined by the probation office.

### Supervised Release

62.   **Statutory Provisions:**  The Court is required to impose a term of supervised release of at least five years.  21 USC § 960(b)(1).

63.   **Guideline Provisions:** The supervised release term is five years. USSG §5D1.2(c).

63a.   The Court ordinarily should not impose a term of supervised release in a case in which supervised release is not required by statute and the defendant is a deportable alien who likely will be deported after imprisonment. USSG §5D1.1(c).

64.   If a sentence of imprisonment of one year or less is imposed, a term of supervised release is optional. USSG §5D1.1(b). Supervised release is required if the Court imposes a term of imprisonment of more than one year or when required by statute. USSG §5D1.1(a).

65.   In addition to the mandatory and discretionary conditions of supervision, 18 USC § 3583(d), the Court may impose other conditions as they relate to the nature and circumstances of the offense and the history and characteristics of the defendant. 18 USC § 3553(a)(1).

66.   In consideration of the above, the Court may impose the following additional condition: (a) deportation compliance.

---

[4]The United States government makes assurances to the Colombian government that there will be no sentence of death or life imprisonment. Colombian government officials have advised that there is no limit on the term of years a sentencing court can impose.

### Probation

67.    **Statutory Provisions:**  The defendant is not eligible for probation because the instant offense is a Class A felony and is expressly precluded by statute. 18 USC § 3561(a)(1) and 21 USC §960(b)(1).

68.    **Guideline Provisions:** Because the applicable guideline range is in Zone D of the Sentencing Table, the defendant is not eligible for probation.  USSG §5B1.1, comment. (n.2), and USSG §5C1.1(f).

### Mandatory Drug Testing

69.    The Violent Crime Control and Law Enforcement Act of 1994 requires an individual under supervision, whose offense occurred after September 13, 1994, refrain from the unlawful use of a controlled substance; submit to one drug test within fifteen days of the commencement of supervision; and two additional periodic drug tests.  The condition for mandatory drug testing may be ameliorated or suspended by the Court if reliable sentencing information indicates a low risk of future substance abuse by the defendant. 18 USC §§ 3563(a)(5) and 3583(d).

### DNA Requirement

70.    Pursuant to 42 USC § 14135a(a)-(d), for all felony offenses, the defendant shall submit to the collection and use of DNA identification information while incarcerated in the Bureau of Prisons, or at the direction of the U.S. Probation Office.

### Fines

71.    **Statutory Provisions:**  The maximum fine is $4,000,000. 21 USC §§ 963, 960(a)(1) and 960(b)(1)(A).

72.    A special assessment of $100 is mandatory. 18 USC § 3013(a)(2)(A). The special assessment remains unpaid.

73.    **Guideline Provisions:** The fine range for the instant offense is from $25,000 to $4,000,000.  USSG §5E1.2(c)(3) and (4).

74.    In determining the fine amount, the Court shall consider, among other factors, the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence. 18 USC § 3572(a)(6) and USSG §5E1.2(d)(7). The most recent advisory from the Administrative Office of the United States Courts suggests that the Court use a monthly cost of $2,357.01 for imprisonment, a monthly cost of $2,153.22 for community confinement, and a monthly cost of $328.20 for supervision.

### Restitution

75.     Notwithstanding any other provision of law, when sentencing a defendant convicted of
        an offense described sections 404, 408(a), 409, 416, 420, or 422(a) of the Controlled
        Substance Act (21 USC §§ 841, 848(a), 849, 856, 861, 863) in which there are no
        identifiable victims, the Court may order that the defendant make restitution.  18 USC §
        3663(c)(1), § 3663(a)(1)(B)(i)(II), and § 3663(ii).  Sixty-five percent of the total amount
        of restitution shall be paid to the entity designated to administer crime victim assistance
        in the state in which the crime occurred.  Thirty-five percent of the total amount of
        restitution shall be paid to the state entity designated to receive federal substance abuse
        block grant funds.

### Denial of Federal Benefits

76.     **Statutory Provisions:**  Upon a first conviction for trafficking in controlled substances, a
        defendant may be declared ineligible for any or all federal benefits for up to five years, as
        determined by the Court.  21 USC § 862(a)(1)(A).  Individuals convicted of any felony
        drug possession, use, or distribution offense shall not be eligible for assistance under any
        State program funded under Part A of Title IV of the Social Security Act, benefits under
        the food stamp program of the Food Stamp Act of 1977, or any State program carried out
        under the food stamp program of the Food Stamp Act of 1977.  21 USC § 862a.
        However, pursuant to 21 USC § 862(e), this provision is not applicable to the defendant.

77.     **Guideline Provisions:**  The Court may deny eligibility for certain federal benefits of any
        individual convicted for trafficking in controlled substances. USSG §5F1.6. However,
        this provision is not applicable to the defendant.  USSG §5F1.6, comment. (n.1).

## PART E. FACTORS THAT MAY WARRANT DEPARTURE

78.     The defendant agreed not to oppose a 1-level increase in his base offense level under
        USSG §2D1.1, comment (n.16), which would result in a total offense level of 42, and a
        guideline imprisonment range of 360 months to Life.

79.     Present law requires an alien convicted of a federal offense who is sentenced to
        imprisonment serve the entire sentence (less statutory good time and time served) before
        deportation. The defendant's status as an alien precludes him from eligibility for
        participation in certain programs, or from other considerations as an inmate in the U.S.
        Bureau of Prisons while serving the sentence for the instant offense.

80.     The defendant's status as a deportable alien may warrant a downward departure from the guidelines. Title 18 USC § 3624(c) authorizes the U. S. Bureau of Prisons, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last 10 percent of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for re-entry to the community. In Lartey v. Department of Justice, 790 F. Supp. 130 (U.S. District Court W/D LA 1992), the Court determined that the right to participate in pre-release programs only applies to prisoners who are being released to a community within the United States, thereby excluding deportable aliens.

81.     The DC Circuit has ruled that a downward departure may be appropriate if the defendant's status as a deportable alien is likely to cause fortuitous increase in the severity of his confinement.  U.S. v. Smith, 27 F.3d 649, (307  U.S. App.  DC 1999).The probation office did not apply any departures under USSG Ch. 5. If the Court concurs, then the Court should consider whether a variance, a non-guideline sentence, under 18 USC § 3553, is warranted.

82.     The Court is required to impose a sentence that is sufficient but not greater than necessary to comply with 18 USC § 3553(a) which outlines the factors to be considered when imposing a sentence. In addition to considering the U.S. Sentencing Guidelines, the Court should also consider a sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. The Court shall also consider the nature and circumstances of the offense, the history and characteristics of the defendant.

                              Respectfully submitted,

                              **GENNINE A. HAGAR**
                              **CHIEF UNITED STATES PROBATION OFFICER**

                   By:     _____
                              Michael Penders
                              United States Probation Officer

APPROVED BY:

                   2012.03.26 14:40:45
                   -04'00'
_____
Brian D. Shaffer                              Date
Supervising United States Probation Officer

**ADDENDUM TO THE PRESENTENCE REPORT**
**UNITED STATES VS.  SALVATORE MANCUSO-GOMEZ**
**DOCKET NO.:1:02CR00388-002**


**DISCLOSURE AND OBJECTION CHRONOLOGY**

The presentence report was disclosed to counsel on 08/24/2010.  The Government and the defendant and Defense Counsel have not submitted Receipt and Acknowledgment forms to the Probation Office. On 03/12/2012, an email was sent to opposing counsel seeking a Receipt and Acknowledgment form. As of the date of filing, the probation office has not received a response.

Supplemental Information Added After Disclosure

Paragraph #63a was added pursuant to the 2011 United States Sentencing Guidelines.


Respectfully submitted,

**GENNINE A. HAGAR**
**CHIEF UNITED STATES PROBATION OFFICER**

By:  _____
Michael Penders
United States Probation Officer


APPROVED BY:

2012.03.26 14:41:10
-04'00'
_____
Brian D. Shaffer                          Date
Supervising United States Probation Officer