UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| Plaintiff, | : | Criminal Action |
| | : | No. 02-388-02 |
| v. | : | |
| | : | |
| SALVATORE MANCUSO-GOMEZ, | : | March 18, 2015 |
| | : | 2:00 p.m. |
| | : | |
| | : | |
| Defendant. | : | Washington, D.C. |
| | : | |
| ............................ | : | |

**TRANSCRIPT OF MOTION HEARING PROCEEDINGS**
**BEFORE THE HONORABLE ELLEN SEGAL HUVELLE,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the United States:     **Paul Warren Laymon, Jr., Esq.**
                           U.S. DEPARTMENT OF JUSTICE
                           Narcotics and Dangerous Drug
                           Section
                           145 N Street, NE
                           Second Floor, East Wing
                           Washington, DC 20530
                           (202) 514-1286
                           Fax: (202) 330-1400
                           Email: Paul.laymon@usdoj.gov


For the Defendant:         **Joaquin G. Perez, Esq.**
                           6780 Coral Way
                           Suite 200
                           Miami, FL 33155
                           (305) 261-4000
                           Email: Jplaw1@bellsouth.net

APPEARANCES:   Cont.

Interpreters:                    **Gladys Segal, Federally Certified**
                                 **Interpreter**

                                 **Theresa Salazar, Federally**
                                 **Certified Interpreter**

Court Reporter:                  **Scott L. Wallace, RDR, CRR**
                                 **Official Court Reporter**
                                 Room 6503, U.S. Courthouse
                                 Washington, D.C. 20001
                                 202.354.3196
                                 scottlyn01@aol.com

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

<u>**AFTERNOON SESSION, MARCH 18, 2015**</u>

(2:12 p.m.)

THE COURT:  Okay.  Go ahead, Mr. Laymon.  Do you want to swear the witness?

MR. PEREZ:  Judge, as a scheduling matter, Mr. Spelke and Mr. Shriver are in the back of the courtroom.  I don't anticipate we'll reach them today.  I was wondering if the Court would be willing to reschedule this and maybe do it tomorrow morning.  Their testimony is going to be quick because it's also --

THE COURT:  I'm not available tomorrow morning.  So, I can only -- Mr. Spelke, what's your -- can you do it on -- it seems to me we ought to do it -- move sentencing Monday and finish him up on the 7th.  Who is the other witness?

MR. PEREZ:  The other is the case agent, Mr. Shriver.  Mr. Shriver is present in court.  He's the case agent that handled the case from the outset.  Both of them are relevant to some of the inquiries before the Court, and if we could hear them some time before April 7th, maybe a morning --

THE COURT:  I mean, how long do you think your two witnesses are going to be?  And then there's one more.  I just cancelled everything at 4:00.  We did the conference call.  So, we can sit until 5, but that's the best we can do.  I mean this --

MR. LAYMON:  Judge, my two witnesses, of course, are both Spanish speakers, so we'll have to have the interpreters.  I

```
 1   intend to get through it relatively quickly.  I don't know how
 2   long the cross will be, but I would estimate two hours for both
 3   of them.  It could go a little bit longer again.
 4        THE COURT:  And then we have some other witness here, so I
 5   think we do have to reschedule, because if it's two hours for two
 6   and one more witness, no matter how long that person is, we've
 7   gone over.  So, sorry about this.  When do you want to -- okay.
 8   I'm off to an MDL tomorrow, so I fly west, and I'm gone for the
 9   week.
10        MR. PEREZ:  What about Friday --
11        THE COURT:  No, I'm leaving.
12        MR. PEREZ:  Oh.
13        THE COURT:  So it has to be the week -- we can do it the
14   1st -- I mean, by the time get to sentencing, will there be
15   anything else?  I will have read the pleadings.
16        MR. PEREZ:  I think by the time you get to sentencing,
17   you're ready to impose sentencing after you hear from the
18   witnesses.
19        THE COURT:  All right.  Well, can we do it either the 31st
20   or the 1st, the 1st preferably?
21        MR. PEREZ:  The 1st is fine with me.
22        THE COURT:  Mr. Laymon.
23        MR. LAYMON:  Are you talking about the 1st of April, Your
24   Honor?
25        THE COURT:  Yes, I am.  Mr. Spelke.
```

1      MR. SPELKE:  Your Honor, first of all, good to see you

2 back on the bench.  I trust you're doing well.

3      THE COURT:  Thank you.  Thanks.

4      MR. SPELKE:  Your Honor, the 1st is fine with me and DEA

5 Special Agent Shriver and I can be back on the 1st.

6      THE COURT:  Fine.  Thank you.  10:00.

7      MR. SPELKE:  Thank you, Your Honor.

8      THE COURT:  Okay.  Michelle, this is to resume at 10:00.

9      THE COURTROOM CLERK:  Yes, Your Honor.

10      THE COURT:  And the sentencing is the following week at

11 10:30?

12      MR. LAYMON:  7th.

13      THE COURT:  And we'll be finished by noon?

14      MR. PEREZ:  And we don't have to use interpreters, so it

15 should be quick.

16      THE COURT:  Well, he needs an interpreter.  So we'll take

17 Mr. Spelke and the agent on the 1st.

18      MR. SPELKE:  Thank you, Your Honor.

19      THE COURT:  Okay.  Would you please rise and raise your

20 right hand, please.

21   (GIOVANNY ALVAREZ SANTOYO, WITNESS IN THE CASE, SWORN.)

22      DIRECT EXAMINATION OF GIOVANNY ALVAREZ SANTOYO

23 BY MR. LAYMON:

24 Q.   Mr. Alvarez, be seated.  Would you state your name

25 please?

1    **A.**      My name is Giovanny Alvarez Santoyo.

2    **Q.**      Mr. Alvarez, how are you employed?

3    **A.**      I work for the Prosecutor's Office, the general

4    Prosecutor's Office in Colombia.

5    **Q.**      And in what city in Colombia are you assigned?

6    **A.**      Currently I'm assigned to the city of Bogata.

7    **Q.**      For how long have you been a prosecutor in Colombia?

8    **A.**      From 19 -- I came into the Prosecutor's Office as an

9    assistant prosecutor in 19 -- I came into the office in 1992 as

10   an assistant prosecutor starting in 1996 to this date.

11   **Q.**      Briefly tell me the jobs that you've had over the years

12   in which your work involved the paramilitaries and the

13   guerillas?

14   **A.**      From 1992 when I entered the office of the prosecutor --

15   of prosecution.  I was assigned to a section that was the -- it

16   was a regional prosecution section.  There were five regions in

17   the country, and I was assigned to the region of Caqueta.

18            And in that period in the region we investigated illegal

19   groups, guerillas, paramilitary groups in Santander and

20   organized crime.

21   **Q.**      Let's --

22   **A.**      And drug trafficking.

23   **Q.**      Let me try to cut through this and ask you, when did you

24   go to the Justice and Peace Program?

25   **A.**      I went into the Justice and Peace Program in June of

1    2011.

2    **Q.**    And have you been with the Justice and Peace Program

3    since then?

4    **A.**    That is correct.

5    **Q.**    And what is your role with Justice and Peace?

6    **A.**    The leadership of the Program of Justice and Peace has

7    set priority groups, and I coordinate group number 1, which

8    has -- which has been assigned to the case of Salvatore

9    Mancuso-Gomez.

10   **Q.**    And for how many years have you focused on

11   Mr. Mancuso-Gomez?

12   **A.**    Well, since I entered the unit and for nine years, I was

13   a prosecutor that worked on cases of human rights, the national

14   unit of human rights with -- this was with national

15   jurisdiction.  Starting in the year 2000, I started

16   investigating the case of Mr. -- the cases involving

17   Mr. Salvatore Mancuso-Gomez.

18   **Q.**    Briefly tell me, briefly tell the Court, what is the

19   Justice and Peace Program?  What does it do?  What is its

20   purpose?

21   **A.**    Well, the program or the process of Justice and Peace

22   started with the negotiations between Colombia and the -- after

23   the negotiations started between the government of Colombia and

24   the paramilitary and the paramilitary groups.

25         The process has three phases.  The first phase is

1   administrative, and it involves negotiations between the

2   government and illegal groups, and among them the paramilitaries

3   that operated in Colombia.

4        The second phase is the phase of demobilization.  The

5   demobilization of illegal groups by which they committed to lay

6   down their weapons, promised to give up their weapons and the

7   rest of their wealth obtained illegally, houses, vehicles,

8   motorcycles.

9   **Q.**    And what is the third phase?

10  **A.**    And so in the third phase, all or some of the named --

11  the aforementioned individuals are put before a national process

12  of Justice and Peace.  This is the judicial process where first

13  the deeds are documented, and second, they are brought before

14  the Court for sentencing at the transitional phase.

15  **Q.**    Did you --

16  **A.**    And may I?

17  **Q.**    Please.

18  **A.**    Thank you.  This process is carried out if the person in

19  question meets their obligations.  Then -- he could be sentenced

20  to a maximum of 40 years, but if he meets his obligations, which

21  means to tell the truth, to do reparations, and to commit to not

22  commit any additional crimes, then the individual is sentenced

23  to an alternative sentence of eight years.

24  **Q.**    Did you prepare a report with the assistance of your

25  colleagues dealing Mr. Mancuso's assistance in the Justice and

1    Peace Program?

2    **A.**     Of course.  In the course of the investigation, a report

3    was drafted pertaining to the cooperation of the subject of

4    Mr. Mancuso.

5    **Q.**     Let me show you what I've marked as Government's

6    Exhibit 4, and I'm going to display it here first.

7          THE COURT:  This is not in the exhibit --

8          MR. LAYMON:  No, that's a separate exhibit.  Well, I take

9    that back.  It may actually be in the back, but this is the

10   government's exhibit.

11         Mr. Alvarez, do you recognize this as the report that you

12   prepared in regards to Mr. Mancuso?

13   **A.**     Yes.  This is the first -- this is page 1 of the report

14   that was prepared.

15   **Q.**     And if I turn it to the back, page 21, is that your

16   signature?

17         THE INTERPRETER:  The interpreter requests an opportunity

18   to interpret.

19         THE WITNESS:  Yes, that is my signature as prosecutor 46

20   of the Transitional Justice Direction.

21   BY MR. LAYMON:

22   **Q.**     And is this, in fact, a copy of your report?

23   **A.**     That is correct.

24         THE COURT:  Mr. Laymon, what are you going to do with

25   these exhibits?

1       MR. LAYMON:  I'm sorry, Your Honor?

2       THE COURT:  What are you going to do with your exhibits?

3       MR. LAYMON:  Well, I was going to move to admit them.  I

4  have the Spanish version and the English version.

5       THE COURT:  Are you going to give us a set of your

6  exhibits like the defendants have given us a set here?

7       MR. LAYMON:  I'm about to do that, Your Honor.

8       THE COURT:  Okay.

9       MR. LAYMON:  I would move into evidence what's been marked

10  as Government's Exhibit 4, and then 4A is the English

11  translation.

12       THE COURT:  Any objection?

13       MR. PEREZ:  No objection.

14       MR. LAYMON:  May I approach and hand him Exhibit 4, Your

15  Honor?

16       THE COURT:  Good.

17       (Government's Exhibit 4 admitted into the record.)

18       THE COURT:  Can I see 4A, please?

19  BY MR. LAYMON:

20  Q.    Mr. Alvarez, before we get to your report which we're

21  going to do in just a few minutes --

22       (Discussion had off the record.)

23  BY MR. LAYMON:

24  Q.    Pardon.  I'm going to get to your report in just a

25  minute, but before we do that I would like to turn your

1  attention to the map I'm displaying marked as Government's

2  Exhibit 3.

3       Mr. Alvarez, based on your experience with the AUSA, can

4  you tell me when and how Mr. Mancuso came to be involved in the

5  paramilitaries?

6  **A.**    Yes, of course.

7  **Q.**    If you would please start and then let the interpreter

8  translate your remarks after just a minute or two.

9  **A.**    The subject, Mr. Mancuso, he was born in Monteria in the

10  Department of Córdoba in Colombia where he lived and married.

11  In 1990, 1991, like many Colombians, he was a victim of gorilla

12  extortion, which he -- which he refused to collaborate with, and

13  he started cooperating with the law.  In 1992 he became involved

14  in illegal activities with the AUC, and he organized a group of

15  the AUC.

16  **Q.**    Now, this was Córdoba here?

17  **A.**    That is correct, sir.

18  **Q.**    And is this where Mr. Mancuso first became active with

19  the paramilitary groups?

20  **A.**    That is correct.

21  **Q.**    And after he became active in Córdoba, then who did he

22  join with?

23  **A.**    He operated in areas of Córdoba, and in 1994 he was

24  contacted by Carlos -- by the brothers Carlos and Vicente

25  Castaño Gil and he was summoned to a meeting.

1  **Q.**    Now, who were Carlos and Vicente Castaño and why were

2  they significant?

3  **A.**    Carlos and Vicente Castaño Gil were held back from

4  Antioquia and they formed a paramilitary group that operated in

5  Antioquia and Córdoba.

6  **Q.**    And after meeting with the Castaño brothers, what

7  happens?

8  **A.**    Well, after they agreed to join together, to work

9  together, after they joined forces, they began in 1995 to, what

10 is called, to carry out the expansion of the AUC or the

11 self-defense forces.

12 **Q.**    And from 1995 until, say, 2002, what became of the AUC,

13 what did they do?

14 **A.**    Well, during the developmental phase of this period that

15 was called the expansion period, Mr. Mancuso was contacted by

16 Carlos Castaño Gil to carry out sporadic operations in the areas

17 of Sucre and Bolivar which I point out here on the map because

18 they were the closest areas to Córdoba.

19 **Q.**    All right.  Let me circle that area and I'll ask you a

20 question.

21        Is that the area of expansion that you've described?

22 **A.**    That's right.  That's the beginning part.

23 **Q.**    And then, after the group expanded into this area, what

24 happened?

25 **A.**    Well, the expansion continues, and in '96 they expanded

1    to the departments of Magdalena and Cesar.

2    **Q.**    Is that about right?

3    **A.**    That's right.

4    **Q.**    And what happens after that?

5    **A.**    Well, the expansion continues and after which groups of

6    operation were in action, especially in the department of

7    Bolivar where Mancuso had his groups.  There were also groups in

8    the municipalities of Atlantico -- and the expansion, the

9    Department of Atlantico and the expansion covered the northern

10   areas of the country, including the Department of Atlantico and

11   La Guajira.

12   **Q.**    In 2002, what parts of Colombia were the AUC active?

13   **A.**    Well, I would like to add something because it's

14   something that the prosecution in Colombia felt was very

15   important, that after they had reached the coastal areas of the

16   country, Mr. Mancuso made up a group that covered the Department

17   of North Santander in 1999, so that by 2002 Salvatore Mancuso

18   commanded or dominated the departments of the northern coast of

19   Colombia, plus Santander, which made him have control of eight

20   departments.

21   **Q.**    So by 2002, would this be accurate -- (indicating area on

22   map)?  Is that the area that Mr. Mancuso controlled with the

23   AUC?

24   **A.**    Yes, with the exception of the Department of --

25   Santander, that would be the area that was under his control.

1    **Q.**    And eventually did he spread -- did his forces spread

2    into the nearby departments of Arauca?

3    **A.**    Well, it's true that this area does border Arauca, but

4    with regard to Mr. Mancuso, I don't have any specific

5    information that he had a group operating there.  Now, he did

6    operate in other parts of the country.  There were operations

7    carried out in the Department of Meta, but these were primarily

8    support operations that were carried out there.

9    **Q.**    So, Mr. Alvarez, let me do this -- go ahead.

10   **A.**    Well, he often took part in operations in the area of

11   Antioquia, and I need to mention that he participated in one

12   operation in Colombia that had to do with the creation or then

13   incipient capital block, as it was called, and that was in

14   reference to the capital city of Bogata where Mr. Mancuso was in

15   charge of putting together a group that would be operating

16   there.

17   **Q.**    I want to hand you -- I want to hand you this map marked

18   as Government's Exhibit 3 and this black pen, and what I would

19   like you to do is, just so we can preserve this for the record,

20   is just circle the areas of Colombia that Mr. Mancuso and his

21   group controlled by the end of 2002.

22   **A.**    Do you want me to draw a circle that would cover all the

23   departments at one time?

24   **Q.**    All the departments that they controlled up to the end of

25   2002.

1    **A.**     Just one whole circle?

2    **Q.**     One circle.

3    **A.**     (Witness complied.)

4    **Q.**     Are you done?

5    **A.**     Yes.

6    **Q.**     So, shifting gears, within that area that you've circled,

7    in which departments was Mr. Mancuso trafficking drugs?

8    **A.**     If you would allow it, I would like to illustrate my

9    response.

10   **Q.**     Please.

11   **A.**     Well, the initial activity that was carried out by the

12   paramilitary groups was a fight against the counterinsurgency;

13   that is, confrontations with the guerillas, but it had been

14   noticed that the guerillas were financing themselves through

15   drug trafficking.  So there was a fight, there was a battle that

16   was initiated to take over the areas where the guerillas were

17   carrying out their drug trafficking operations for their own --

18   for financing themselves, and the fight or the struggle

19   originally began for ideological reasons, but also added to this

20   were the financial interests, and it has been documented that

21   the drug trafficking was carried out by the guerillas --

22   supported by the paramilitaries; that is, the drugs were carried

23   out through various areas of Colombia, including the Sierra

24   Nevada, Santa Marta, the ports of -- and the northern coast,

25   North Santander.  Also, the gulf of Motoskio and Sucre and the

1    ports of Cartagena, as well as drug trafficking that was taking

2    place through Alta Guajira, and, as mentioned, the Department of

3    Northern Santander where the drugs were being sent to Venezuela

4    by Catacumbo.

5    Q.    And why would Mr. Mancuso and his colleagues want to be

6    active in those areas?

7    A.    Well, as I previously stated, this was a means of

8    financing that the guerillas had, and they wanted to have better

9    conditions for their group that had been formed outside the law.

10   Q.    Now, by -- just a couple of definitions here.  By

11   "guerillas" do you essentially mean the FARC?

12   A.    Well, not -- yes, the FARC, but there are other gorilla

13   groups like the LLN and the LPN, to name a few.

14   Q.    Let's turn our attention to your report.  You and your

15   colleagues interviewed Mr. Mancuso and other witnesses as part

16   of the Justice and Peace process; is that correct?

17   A.    That's right.

18   Q.    And does your report indicate the length of time and the

19   number of meetings that you had with Mr. Mancuso?

20   A.    It was not only myself, but also the prosecutors who came

21   before me.

22   Q.    And over what period of time and for how many days did

23   Mr. Mancuso submit to interviews or statements?

24   A.    As it appears in the report, there were many sessions

25   with the subject, with Mr. Mancuso starting December 19th of

1    2006, and you can see it in that first version that is available

2    here in court that was recorded, and then the last version,

3    which is not available to us right now that was not recorded,

4    done the first week of March of this year, which I did directly.

5    So there were sessions, meetings between two and five days a

6    week, and I'm wondering whether I should read the details of

7    when those meetings took place.

8         And so 19th and 20th of December of '06, the 15th and the

9    16th of January of '07, the 15th and 16th of '07, the 8th, 9th

10   and 10th of October of '07, 26th and 27th of November of '07,

11   the 18th and 19th of '07 and February 26th -- 20 through 21st of

12   2007.

13   Q.    Let's not -- we don't need to go through all the dates.

14   However, you can tell me, though, how many different days you

15   interviewed Mr. Mancuso.

16   A.    Well, I, as a prosecutor in the case, conduct meetings,

17   and these meetings are called versions.  These are meetings that

18   we have with their counsel present.

19   Q.    As a result of these meetings -- I'm sorry, go ahead.

20   A.    If we're going to count days, I have had interviews with

21   Mr. Mancuso 50 days -- more than 50 days in the process of

22   investigating the case in the Justice and Peace process between

23   February of 2013 and March of 2015, which was the last meeting

24   that was -- that was held with him.

25   Q.    Now, as a result of the Justice and Peace meetings with

1    Mr. Mancuso and with other witnesses, did your office determine

2    that various -- that various acts could be charged?

3    A.    That is correct.

4    Q.    And how many such acts have you identified to this day?

5    A.    In the meetings and in the interactions that we've had

6    with Mr. Mancuso, more than 5,000 criminal acts have been

7    identified.

8         We have charged more than 4800 matters.  There have been

9    sentences related to Mancuso in 2,546 matters that have gone

10   before the judges, matters that may range from murder to forced

11   disappearances, through forced removals, recruiting of minors,

12   sexual violence, sexual slavery, and other related matters, and

13   related crimes such as kidnapping, terrorism, theft, and removal

14   of protected -- destruction of protected property.  There is a

15   very, very large range of crimes involved.

16   Q.    As to those crimes, as to those acts, did Mr. Mancuso

17   tell you that he accepted responsibility for those?

18   A.    Yes, that is correct.

19   Q.    You mentioned that some of these acts have already

20   appeared before the judges.  Let me refer you to opinions that

21   came out in October and November of 2014.

22        In other words, tell me briefly what the Superior Court

23   for the Justice and Peace issued in October and November of

24   2014.

25   A.    These decisions of October, November 2014 are not

1    decisions of the Supreme Court, they're decisions of the Court

2    of Justice and Peace.  And I clarify whether these are the two

3    sentences that were -- that were set for -- against Mr. Mancuso

4    and others who were involved in the macro criminal structure.

5    Q.    And what was the sentence that Mr. Mancuso received in

6    each of those two cases?

7    A.    In each of these cases, he was sentenced to 40 years in

8    prison, but within the framework of the Justice and Peace

9    process, there is the concept of the benefit of the alternate

10   sentence, and given this alternate -- alternative sentence, he

11   was afforded that sentence of eight years.

12   Q.    And was Mr. Mancuso, in fact, eligible for the alternate

13   sentence of eight years?

14   A.    Yes, of course.  He has been doing his part as part of

15   the Justice and Peace process, and therefore he has qualified

16   for the alternative sentence of eight years.

17   Q.    Will there be other criminal sentences handed down by

18   courts in the Justice and Peace Program against Mr. Mancuso?

19   A.    Undoubtedly.  Last year a request was made for what is

20   considered a -- what is called a concentrated hearing regarding

21   1536 other matters of which Mr. Mancuso has been accused.

22   Q.    And is it anticipated that he will also be eligible for

23   an eight-year sentence in those cases?

24   A.    That's what is hoped, that those who have made a

25   commitment continue fulfilling their commitment with Justice and

1   Peace to the very end.  And given that he has been keeping his

2   commitment, the hearing, the aforementioned hearing was

3   conducted.

4   Q.    Let me call your attention as we close this out,

5   Mr. Alvarez, to the fifth section of your report beginning on

6   the page that is marked page 16.

7         Now, you have been describing a process in which

8   Mr. Mancuso and others provide information to you.  Did he

9   provide information to you about what you would term significant

10  acts?

11  A.    Yes.

12  Q.    And why would you want to know about these significant

13  acts?

14  A.    Well, let's look at this within the context of our

15  country.  We're talking about events, acts here that are very

16  important because of their overall effect, the number of people

17  they hurt, the number of victims involved, the cruelty with

18  which they were carried out, and here we mention specific

19  massacres like the Lado massacre and the Salado massacre.

20  Q.    So, let me call your attention to Section 5.1 of your

21  report.  Did Mr. Mancuso provide information to you that allowed

22  you to further the investigations of these massacres?

23  A.    Well, I need to explain my response there.  The Office of

24  the Prosecution had already started these investigations before

25  the Justice and Peace Program began, so these investigations

1    were already underway, and they did not begin because of Peace

2    and Justice.  They had started with the -- they originated with

3    the prosecution, which had already identified people linked to

4    events such as the Salado massacre and the Lado massacre, but

5    Mr. Mancuso, along with others through the Justice and Peace

6    process program, provided additional information on these acts,

7    on these events in terms of how they happened, how the massacres

8    were carried out.

9    Q.    And did Mr. Mancuso accept responsibility for them?

10   A.    That's right.

11   Q.    And in those events, Mr. Alvarez, did Mr. Mancuso tell

12   you how many people were killed?

13         THE COURT:  Mr. Laymon, we're never going to get two

14   witnesses done.

15         MR. LAYMON:  I'm almost done, Your Honor.

16         THE WITNESS:  No, no, not about the number of people that

17   died.  In fact, many died in the massacres.  The one I'm most

18   familiar with is the Salado massacre which took place in February

19   of 2000 where 59 people died, and this is known to me because it

20   was the prosecution that went in to recover the bodies of the

21   victims and with the help of family members who cooperated were

22   able to establish this fact.

23         When this massacre was carried out by the paramilitary

24   group, they came in from different areas, from different

25   directions, so they really did not know how many, in fact, had

1   died at their hands, I don't think.

2   BY MR. LAYMON:

3   **Q.**    Mr. Alvarez, let me turn to the very last part of your

4   report, and this is where we will end.

5        As part of your cooperation with the Justice and Peace

6   Program, Mr. Mancuso would talk with you about his ties to

7   public officials; is that correct?

8   **A.**    That is true.  He spoke about certain public officials.

9   **Q.**    You and your office, as part of the Justice and Peace

10  process, you did not have the authority to investigate those

11  cases; isn't that right?

12  **A.**    That's right.

13  **Q.**    That information would be passed on to other sections of

14  the government, including the Supreme Court, correct?

15  **A.**    Yes, sir, that's right.

16  **Q.**    All right.

17       MR. LAYMON:  I have no other questions for Mr. Alvarez,

18  Your Honor.

19       THE COURT:  I have one question.  Has the Supreme Court

20  prosecuted him and sentenced him?

21       THE WITNESS:  Salvatore Mancuso?  I don't know.

22       MR. PEREZ:  The Supreme Court only prosecutes politicians.

23  Mancuso was prosecuted by the Justice and Peace court, which is a

24  lower court.  The reason why I suppose the Supreme Court

25  investigates politicians is presumably because they have the

```
 1   power as coequal branches of the government in Colombia.

 2           THE COURT:  Okay.

 3           MR. PEREZ:  May I proceed?

 4           THE COURT:  Yeah.  How long are you going to be?

 5           MR. PEREZ:  It's going to be at least -- Mr. Laymon was

 6   for an hour and a half, so it's going to take at least 20 minutes

 7   to half an hour.

 8           THE COURT:  Who are your other two witnesses?  I mean, it

 9   baffles me.

10           MR. LAYMON:  Your Honor, we only --

11           THE COURT:  Are they both Spanish speakers?

12           MR. LAYMON:  We have one witness remaining, another person

13   from Justice and Peace, but her testimony is much shorter.

14           THE COURT:  And what about you, what's your --

15           MR. PEREZ:  I have Mr. Spelke and Mr. Shriver.

16           THE COURT:  No, no, no, they're another day.

17           MR. PEREZ:  I think I have one witness who may be outside.

18   She'll be quick.

19           THE COURT:  All right.  Well, we're going to take a

20   ten-minute recess.  Okay.

21           (Thereupon, a break was had from 3:26 p.m. until 3:39

22   p.m.)

23           THE COURT:  Okay.

24           MR. PEREZ:  We're waiting for the defendant.

25           THE COURT:  You have until 5, and if it's going to be your
```

1    witness, it will be --

2         MR. PEREZ:  Thank you.  I think that if we have to, we can

3    call him another time.  This is important.

4         THE COURT:  Okay.  We're stopping at 5.

5              CROSS-EXAMINATION OF GIOVANNY ALVAREZ SANTOYO

6    BY MR. PEREZ:

7    Q.    Mr. Alvarez, I think you testified extensively about

8    matters that Mr. Mancuso told you, correct?

9    A.    Yes, Mr. Mancuso and others that have been in the process

10   of Justice and Peace.

11   Q.    But I didn't ask you about all the members of the Justice

12   and Peace, I asked you about Mancuso.  During the many hours

13   that you spent with him, he answered many of your questions, yes

14   or no?

15   A.    Sir, I would have to say no.

16   Q.    So, in other words, he spent 50 hours with you, you

17   questioned him extensively, and you still believe there were

18   others matters that he failed to disclose to you?  Is that what

19   you are saying?

20   A.    I would have to explain my answer.

21   Q.    Explain your answer.

22   A.    Undoubtedly, regarding Mr. Mancuso, the Office of the

23   Prosecution in Colombia has 78,000 matters, criminal matters

24   that relate to the organization headed by Mr. Mancuso.

25         So far we in Colombia, the Office of the Prosecution, has

1    taken statements on more than 5,000 matters he is responsible

2    for where he accepts responsibility for them, but we not only go

3    by what he says, we also go by what others in his structure of

4    command say.

5    Q.    Why don't we go, then, back to the past.  Why don't we go

6    to the late '90s and the year 2002.  Isn't it a fact that the

7    guerillas controlled a very large section of Colombia during

8    that period?

9    A.    When -- okay.  Yes, the guerillas had been operating for

10   many years in Colombia.  At the end -- in the late '90s, in the

11   mid-'90s to 2003, many people -- the guerillas were operating in

12   many parts of the country.

13   Q.    I don't know -- I think that -- for some reason you seem

14   to be looking this way, (indicating).  Maybe -- I'm the one

15   asking you the questions.  Let me ask you the questions the

16   following way, and maybe if you please look at me the answer

17   then will be easier.  You testified that Mancuso at some point

18   was extorted by the guerillas, correct?

19   A.    Yes, they tried to extort him.

20   Q.    They tried to extort many Colombians, many poor and

21   defenseless Colombians, correct?

22   A.    Colombia has endured a period of conflict that is more

23   than 60 years, and all of the groups have resorted to extortions

24   at one time or another.

25   Q.    And specifically the FARC engaged in many acts of

1    extortion against farmers, cattlemen in the northern part of

2    Colombia; is that true, sir?

3    **A.**    That is true.

4    **Q.**    And it's true also that the self-defense groups were

5    formed to a certain degree in order to find the guerillas?

6    **A.**    Initially that was the case.

7    **Q.**    And it is true, sir, that when you have a war and you

8    have people fighting, many innocent people die?

9    **A.**    That is your point of view.  I wouldn't be able to affirm

10   that.

11   **Q.**    You mean to tell me that during the context of a Civil

12   War in which groups are fighting, your testimony is you don't

13   know if innocent people die?  Yes or no?

14   **A.**    I'm not saying that innocent people die.  You asserted

15   what you -- you asserted -- that was your assertion, and I

16   cannot confirm it.

17        Now, in all wars it is true that people die, but the

18   rules of war are such as to try to protect innocent civilians.

19   **Q.**    The FARC has been responsible for many civilian deaths;

20   is that correct?

21   **A.**    Yes.

22   **Q.**    The ELN has also been responsible for the death of many

23   innocent civilians?

24   **A.**    That is correct.

25   **Q.**    When people fight in the midst of a confrontation,

1  individuals die?

2       THE COURT:  Okay.  That's asked and answered.  Move on.  I

3  see that I'm going to relive the history of Colombia in terms of

4  the --

5       MR. PEREZ:  I understand.

6       THE COURT:  Move on.

7  BY MR. PEREZ:

8  Q.    In 2005, were you -- what was the reason for the Justice

9  and Peace Act?

10 A.    Undoubtedly, I would like to clarify that I did not

11 participate in the negotiations of the Justice and Peace

12 Program, but of course negotiations were conducted in order to

13 improve the lot, the situation in the country, the situation in

14 the midst of which the country found itself.

15 Q.    And what conflict did the country find itself?

16 A.    Well, for more than six decades, as I told you before,

17 since 1948, Colombia has been facing a conflict from the time

18 that the guerillas emerged.

19       And so war ensued and it became even more cruel with the

20 advent of the paramilitaries.  And because of those conditions,

21 the government negotiated with the paramilitaries, and now it is

22 negotiating with the guerillas because we Colombians have a

23 right to live in peace and to be free of war.

24 Q.    And the agreement that was made was that if people like

25 Mr. Mancuso told the truth about certain events, that that would

1    be taken into consideration at the time of -- that a sentence

2    was imposed?

3            THE COURT:  That's happened, right?

4            MR. PEREZ:  Yes.

5            THE COURT:  Yes.  Okay.  We know all about this.  Move on.

6    He got sentenced to eight years.  I don't know what point is

7    being made here.

8            MR. PEREZ:  Judge, I think that the cooperation that he

9    has -- that Mr. Mancuso has provided with Colombia is factors

10   that are relevant at the time of sentencing.  I think that

11   factors that were brought up here need to be clarified.  For

12   instance, you talked about certain people and certain people that

13   were killed.  Was Mancuso responsible for them directly or

14   because he was a commander of the AUC?

15           THE INTERPRETER:  The interpreter requests a clarification

16   as to whether that's a question directed to the witness, and if

17   so, please repeat the question.

18   BY MR. PEREZ:

19   Q.    You mentioned that there had been many homicides that

20   Mancuso had been accused of.

21   A.    That is correct.

22   Q.    Did he personally -- was he personally involved in all of

23   those homicides or is he being responsible -- held accountable

24   for the conduct of all the people under his command?

25   A.    (Answer given in Spanish.)

1   **Q.**     Exactly.  So, the point is how many --

2          THE COURT:  One minute.

3   **A.**     Some were ordered directly by him.  He participated in

4   some, but this was a large structure in different areas of the

5   country, and so some were committed under his orders in other

6   areas -- and so he must be held accountable for those.

7   BY MR. PEREZ:

8   **Q.**     So he's being held accountable under a chain of command-

9   type of structure?

10  **A.**     That's right.  He created the group, he created the risk,

11  and therefore he needs to be held responsible for the acts of

12  the group.

13  **Q.**     Now, in your report you indicate that Mancuso had been

14  providing extensive information against private individuals and

15  public officials?

16  **A.**     (Answer given in Spanish.)

17  **Q.**     What about army officers?

18         THE INTERPRETER:  The interpreter requests an opportunity

19  to interpret.

20         THE COURT:  Go ahead.

21  **A.**     There were subjects, yes -- the subject gave

22  information -- Mr. Mancuso gave information about some

23  politicians and private individuals who provided funding for

24  the -- and cooperation with the activities related to financing.

25  **Q.**     What about members of the police?

1   A.      Elements of the police were also mentioned, not only

2   because of what Mancuso said, but also because of what others

3   had said.

4   Q.      And what about Army officers?

5   A.      Yes, he also mentioned some Army officers, but the

6   prosecutors think some are still missing, but he did mention

7   some Army officers.

8   Q.      Did you estimate that the level of his cooperation

9   against politicians, businessmen, public officials and national

10  law enforcement officers gave a score of 80 percent?  Did you

11  give a score of 80 percent insofar as the rating for the

12  cooperation that he helped provide?

13  A.      When we mention the level of cooperation in the report,

14  we are referring to the period or the stage in which the process

15  finds itself, because we still have a long way to go.  Things

16  need to be said still and further developed in the process, and

17  in this case the group that functions outside the law headed by

18  Mr. Salvatore Mancuso has been in operation for ten years.  So I

19  would say that in total we progressed maybe eight percent of

20  what we have to progress, so of that eight percent, he has

21  cooperated 80 percent.

22  Q.      When you say "80 percent," that is a rating insofar as

23  how you estimate his level of cooperation should be assessed?

24  A.      Yes, within the stage or the progress we are making in

25  the process.

1    **Q.**    And with respect to relevant events that took place in

2    Colombia and relevant events, referring to matters that were

3    important to the country of Colombia, you estimated his level of

4    cooperation has risen to 80 percent?

5    **A.**    That 80 percent, within the eight percent that I've

6    previously mentioned, is linked to everything that he has said,

7    as well as others that were part of the structure under his

8    command.

9    **Q.**    Well, did you not write in your report on page 20 that

10   you felt that he had complied and provided assistance and that

11   his level of cooperation in your estimation was 80 percent?

12   Wasn't that what you wrote?

13        THE COURT:  Yes, it's write here.  Go on.  Move on.  I can

14   read it.  It's on page 20 and he gave other scores for other

15   things.

16   BY MR. PEREZ:

17   **Q.**    Insofar as the financing is concerned, that is what, the

18   properties that he turned over to the state?

19        THE INTERPRETER:  I'm sorry, the interpreter requests

20   repetition.

21   BY MR. PEREZ:

22   **Q.**    Insofar as the assets that he turned over to the state

23   for reparation to the victims, did you estimate what is the

24   value of the cooperation that he provided?

25   **A.**    (Gave answer in Spanish.)

1   Q.    May I have one second, please?

2   A.    Well, with regard to assets, I have to excuse myself from

3   answering that question because within the Prosecutor's Office

4   where we work in Justice and Peace, it's divided into two

5   sections.  I'm in charge of documenting the events and the

6   facts, but the documentation of assets is handled by Dr. Fenney,

7   my colleague, and she would have to be the one to respond in any

8   concrete manner to that question.

9         MR. PEREZ:  I have no further questions.

10        THE COURT:  Mr. Laymon?

11        MR. LAYMON:  Let me have just one second.

12        THE COURT:  Can I ask you one other question?  Mr. Mancuso

13   returns to Colombia and faces additional charges.  Can he be

14   sentenced to eight years consecutive or will it be concurrent

15   like the last two?

16        THE WITNESS:  Your Honor, with regard to that subject, the

17   prosecuting of Salvatore Mancuso is one prosecution alone, and he

18   will be charged with everything that he did while commanding the

19   group that he ran, and he, for his actions, will receive one

20   sentence, which will be a maximum of 40 years, but that will be

21   substituted by the alternative sentence of eight years.

22        THE COURT:  And that eight will run at the same time as

23   the other eight?

24        THE WITNESS:  Yes, if you allow me to explain a bit what I

25   am saying to you.

1        THE COURT:  Yes.

2        THE WITNESS:  Thank you.

3        As I was saying, the case against Salvatore Mancuso is one

4   case and one case alone, but what happens is that he is

5   responsible for so many crimes that several sentences will be

6   imposed, will be issued, all of them for eight years, and at the

7   end what will happen is that they will all be combined into one

8   sentence of eight years.

9        THE COURT:  Okay.  Mr. Laymon.

10        MR. LAYMON:  Just to follow up briefly on that, Judge.

11                REDIRECT OF GIOVANNY ALVAREZ SANTOYO

12   BY MR. LAYMON:

13   Q.    Mr. Alvarez, a related but slightly different question.

14        Mr. Mancuso has been in jail in the United States.  When

15   he returns to Colombia, will he receive credit on his eight-year

16   sentence for the time he has served here?

17   A.    Well, with regard to that, I must refer to the Justice

18   and Peace Act; that is law 975 from 2005, and I refer to Article

19   30 and the final subparagraph that states that the sentence can

20   be served abroad, and I would think that the jail time that he

21   has served here will be taken into account as part of his

22   sentence.  Of course, the Court has not made any official

23   statements to that end, but that is what the law says.

24        MR. PEREZ:  I have a question on that issue.

25        THE COURT:  Wait.  Are you finished?  Are you finished

1    with your redirect?

2            MR. LAYMON:  Yes, I am.

3            THE COURT:  Okay.  Go ahead then.  Sorry.

4            RECROSS-EXAMINATION OF GIOVANNY ALVAREZ SANTOYO

5    BY MR. PEREZ:

6    **Q.**    Are you aware of whether, in fact, the Attorney General

7    of Colombia has made any pronouncements regarding the intention

8    of recognizing the time that people like Mr. Mancuso has served

9    in the United States?

10   **A.**    I don't have the authority to answer that, but at any

11   rate that is not something that falls under the jurisdiction of

12   the Attorney General.

13   **Q.**    Are you aware if any lower court or Supreme Court has

14   rendered a decision in a particular case denying a person

15   named Hoover Velosa (phonetic) the concurrency, the time --

16   credit for the time that he served in the United States?

17   **A.**    That's evident in Velosa, and in that circumstance the

18   circumstances were very different.  He was denied recognizing

19   the time because he did not fall within the framework of the

20   Justice and Peace process, and the way he entered drug

21   trafficking was quite different from Salvatore Mancuso, so I

22   would say that the situation and the circumstances were quite

23   different, and he was not accused of drug trafficking.

24           And Mancuso was already tried for drug traffic and a

25   sentence imposed.  And for that reason I repeat the situation is

very different.  It's diametrically different.

Q.     But you remember the question that the Court asked you about whether Mr. Mancuso will receive credit for the time that he spent in the United States and whether there was any precedent regarding this issue?  Do you remember the Court asked that question?

       THE COURT:  I didn't ask about precedence.  I asked the question and he gave the answer that he thought he would get credit, but he's not the sentencing judge.  You said he was already tried for drug trafficking and a sentence was imposed on Mr. Mancuso?  Where was that?

       THE WITNESS:  That was in the court of Justice and Peace, and it was also for acts that he carried out as a member of the armed group functioning outside the law.

BY MR. PEREZ:

Q.     Were those drug trafficking charges that he pled to in Colombia?

A.     With regard to the Catacumbo block and that block was in operation between 1999 and 2004.

Q.     So the answer is he did plead to drug trafficking charges in Colombia?

A.     Yes, as far as his activities that were part of Bloque Catacumbo, but he also operated four blocks in the area, in the northern area, Montes de Maria, Tairona, Córdoba, and the northern block.

1    **Q.**    I guess a final question.  Was he sentenced for his drug

2    trafficking activities?

3    **A.**    Yes.  I repeat, yes, as far as the Catacumbo block is

4    concerned.

5    **Q.**    Thank you.  That's all I have.

6          MR. LAYMON:  No further questions.

7          THE COURT:  Okay.  Thank you.

8          MR. LAYMON:  We'll call our next witness.

9          THE COURT:  Thank you, sir.

10          MR. LAYMON:  Ana Fenney Ospina.

11          THE COURT:  Mr. Laymon, one quick question.  Was there any

12    limitation on sentence in the extradition?

13          MR. LAYMON:  Yes, Your Honor, there was.

14          THE COURT:  What is it?

15          MR. LAYMON:  The limitation on sentencing at the

16    extradition was that we would not ask for a life sentence.

17          THE COURT:  And how do we define that?

18          MR. LAYMON:  I hear my colleague telling me that that is

19    60 years or more.  I know there's been some previous discussion

20    about that issue, Judge, but -- and that it was 60 years or more,

21    but I --

22          THE COURT:  Did you have a discussion at the time of

23    sentencing -- at the time of the plea about this?  Were you --

24          MR. LAYMON:  I was not here at the time of the plea, Your

25    Honor.  That would have been Mr. Spelke.

1      THE COURT:  Michelle, can you look and see, at the time of

2  the plea, who the reporter was, please.

3      (Brief pause in proceedings.)

4      THE COURT:  Yes.  It was Mr. Spelke from DOJ.  I know

5  that.

6      MR. PEREZ:  He was -- and I have the order of the

7  transcript of the change of plea, and it should be -- I can

8  probably have it by the Court by -- have it for the Court

9  tomorrow.

10      THE COURT:  Oh.

11      MR. PEREZ:  You're asking about the change of plea?

12      THE COURT:  Have you read a copy of it?

13      MR. PEREZ:  Yes.

14      THE COURT:  It may be on the -- is it on the --

15      MR. PEREZ:  No, no.  The court reporter has it ready for

16  me to go pick up.

17      THE COURT:  Oh, fine.  If you can provide Mr. -- do you

18  need one, Mr. Laymon.

19      MR. LAYMON:  Certainly, Your Honor.  That would be nice.

20      THE COURT:  Otherwise, is it available on ECF?

21      MR. PEREZ:  I don't know.  I don't know.  Your court

22  reporter told me it was ready yesterday.

23      THE COURT:  Let's swear the witness, please, and then

24  we'll be ready.

25      (ANA FENNEY OSPINA, GOVERNMENT'S WITNESS, SWORN)

<u>DIRECT EXAMINATION OF ANA FENNEY OSPINA</u>

BY MR. LAYMON:

**Q.**     State your name, please.

**A.**     Ana Fenney Ospina.

**Q.**     Can you spell that for us please?

**A.**     A-N-A, F-E-N-N-E-Y, O-S-P-I-N-A.

**Q.**     Ms. Ospina, you are a prosecutor with the Justice -- you were a prosecutor who works with the Justice and Peace Program; is that correct?

**A.**     I am.

**Q.**     And within your office, what section do you work in?

**A.**     I'm a prosecutor, prosecutor number 38.  I'm a coordinator in issues of assets, and I work with the transitional Justice Center.

**Q.**     You assisted your colleague, Mr. Alvarez Santoyo, in preparing a report concerning Mr. Mancuso; is that right?

**A.**     Yes, that is correct.

**Q.**     And you had the part of that that dealt with assets that were surrendered or turned over concerning Mr. Mancuso?

**A.**     Yes, that is correct.

**Q.**     In that regard, did you have occasions to interview Mr. Mancuso?

**A.**     As far as the surrendering of assets and as far as regarding Mr. Mancuso, yes.

**Q.**     And did your information about those assets come from

1    Mr. Mancuso and other people as well?

2    **A.**     Yes.  As part of prosecution -- as part of the procedures

3    that took place November 19 through the 21st, 2013, Mr. Mancuso

4    surrendered assets earmarked for reparation to victims.

5    **Q.**     Over the course of time, how many different assets did

6    Mr. Mancuso surrender?

7    **A.**     We need to differentiate here because the assets that

8    were of -- that were gained by illegal methods required an

9    obligation on his part to surrender.  So he surrendered a total

10   of 86 assets.  These assets were taken from individuals from

11   Bloque Catacumbo where he had influence, and after he was

12   accepted to be the beneficiary of the Justice and Peace process.

13   And so on the following dates, in May of 2007 and October 2007,

14   November of 2011, October of 2011, and November of 2013, he

15   surrendered 120 assets -- 179 assets; the interpreter corrects

16   -- 179 assets that were earmarked for reparation to victims.

17   **Q.**     Now, of the assets that he turned over for surrender, how

18   many did he legitimately own?

19   **A.**     As part of the process of Justice and Peace, it was his

20   obligation to surrender legal and illegal assets obtained either

21   directly or through a third party.  So as far as direct

22   property, there were 29 pieces -- of the 179 assets that had

23   been delivered so far by Mr. Mancuso, as far as reparation of

24   victims go, he had obligation to surrender those assets, either

25   directly his or through a third person.  So far only 29 assets

1    have been surrendered by Mr. Mancuso that were directly his

2    property.

3         In addition to that, a billion point 454 million -- a

4    billion pesos.  These were delivered through his ex-wife,

5    Magdalena, and I forget who was a representative of hers.  These

6    were delivered in cash, and the remainder of the assets, of the

7    29 assets are being required as restitution, which means that

8    individuals or victims are claiming them or they have been

9    claimed because either they -- their land was taken or they were

10   removed from their land.

11        Mr. Mancuso had the obligation to do a restitution of

12   those assets and even so, even so people who claimed to have

13   been expelled from their lands or their lands were seized from

14   them since the beginning of the -- the beginning of his

15   participation in the peace process, and what is identified as

16   part of this process is land that was taken from 30 individuals

17   in what is known as Fincas El Porro or land plots El Porro.

18        He also accepted responsibility for having expelled from

19   his land the owner of the farm Puerto Amor, recognizing that he

20   hadn't completed payments and he returned it.  There was another

21   farm that is called El Perro, and he did is something similar

22   there?

23   **Q.**   Ms. Ospina, let me ask you this:  You mentioned the

24   1.4 billion pesos.  I'm going to come back to that in just a

25   minute, but let me ask you this:  You mentioned that there were

1    29 parcels that Mr. Mancuso surrendered that were directly his.

2    A.     His?

3    Q.     That were directly Mr. Mancuso's.

4    A.     There were 29 assets.  They were actually farms.  They

5    were real estate.

6    Q.     Okay.  Other than those 29, all the other assets that

7    you're talking about, how did Mr. Mancuso acquire all the other

8    assets?

9           MR. PEREZ:  Objection, calls for speculation.

10          THE COURT:  Why don't you -- does she have a basis for

11   answering?

12          MR. LAYMON:  Yes, she does, Judge.

13          MR. PEREZ:  There's no foundation.

14          THE COURT:  Yes, he needs to set a foundation.

15   BY MR. LAYMON:

16   Q.     Ms. Ospina, let me ask you this:  In your investigation

17   of Mr. Mancuso, did you come to learn -- so my question is, did

18   you come to learn how he acquired all of these properties?

19          MR. PEREZ:  Objection.

20          THE COURT:  Overruled, overruled.

21          THE WITNESS:  Yes, sir.

22   BY MR. LAYMON:

23   Q.     How did you learn, how did you come to learn about that?

24   What were your sources of the information?  Don't tell me what

25   the information was, tell me how you came to learn of it.

1    A.    Through the investigation that was conducted and the

2    information that was given by Mr. Mancuso.

3    Q.    And in addition to talking to Mr. Mancuso, did you talk

4    with other witnesses and other victims?

5    A.    Yes, yes, sir.

6    Q.    And based on all of that investigation, how did

7    Mr. Mancuso come to acquire all the other properties, other than

8    the 29?

9    A.    Well, when I was coordinating everything regarding these,

10   more or less 179 assets, Mr. Mancuso himself accepted that he

11   had stripped people of these properties; in later investigations

12   of these properties, not only the 29, but the others, and

13   Mr. Mancuso then said that he had acquired these properties

14   legally, primarily through third persons, third parties.

15        Well, in the investigation of the prosecution, it

16   disclosed that there were people, victims that had been forced

17   to give up their properties in the sense that Mr. Mancuso dealt

18   directly with them, that he bought the properties from them, but

19   at certain prices where they were forced to sell as a result of

20   intimidation.  The people just simply were forced to sell, and

21   of the 179 assets, only 29 have been claimed for restitution.

22   The rest still remain -- and Mr. Mancuso himself has yet to

23   acknowledge that he stripped these people of their properties or

24   forced these people off their properties.

25   Q.    Let me turn to the question of the 1.4 billion pesos.

```
1    When were those turned over to the Colombian government?

2    A.      Specifically, it was in November of 2013.

3    Q.      And what person or persons turned them over to the

4    Colombian government?

5    A.      1,208 million -- 1 million -- 1 billion 288,500 [sic]

6    pesos were turned over by the ex-wife Magdalena Devey, and

7    $166 million -- pesos were turned over by Adolfo Arrieta all

8    under the supervision of -- or under penalty of the prosecution.

9    Q.      Have you --

10   A.      Under penalty of perjury.

11           THE COURT:  Who's the other person?  I'm sorry, there was

12   the ex-wife and who?

13           THE WITNESS:  The ex-wife, Magdalena Devey and Adolfo

14   Arrieta.

15   BY MR. LAYMON:

16   Q.      Have you calculated in today's dollars how much that --

17   how much U.S. dollars those pesos are?

18   A.      It would be about $581,000, and at the time it was turned

19   over $780,000.

20   Q.      Other than that amount of cash, has Mr. Mancuso or any

21   other person on his behalf turned over other cash to the

22   Colombian government?

23   A.      In cash, for that amount of money that I know of, no.

24           MR. LAYMON:  No further questions of this witness, Your

25   Honor.  Wait just a minute.
```

```
 1          THE COURT:  I don't think we'll make it to your next
 2     witness.
 3          MR. PEREZ:  That's fine.
 4          THE COURT:  You can put them, all three on on the first,
 5     okay?
 6          MR. PEREZ:  I just am going to get to the -- cut to the
 7     chase.  I ask the Court to look at paragraph -- page 20,
 8     paragraph 5 of the report.  It says that they were satisfied,
 9     they were 75 percent satisfied that they had made all the
10     reparations, is the report, and I'm not going to belabor the
11     points, so that would be the cross-examination.  If the Court
12     would take notice of what's in the report.
13          THE COURT:  Sure.  What page?
14          MR. PEREZ:  This will be page 20.  That's all I have.
15     Thanks.
16          THE COURT:  All right.  Anything else, Mr. Laymon?  I
17     can't imagine.
18          MR. LAYMON:  No, nothing further.
19          THE COURT:  Thank you.  You may step down.
20          How long is the last witness?
21          MR. PEREZ:  Your Honor, I don't plan to call any
22     additional witnesses.
23          THE COURT:  Oh, you don't, except for the prosecutor and
24     the DEA.
25          MR. PEREZ:  Yes.
```

1          THE COURT:  They'll come at 10:00 on the 1st.  We'll

2     finish, and then the sentencing will be the week after, and

3     you'll provide me a copy of the transcript from the plea?

4          MR. PEREZ:  Yes.

5          THE COURT:  Was it one time or did we meet more than once?

6          MR. PEREZ:  Once.

7          THE COURT:  All right.  Anything else that -- I have the

8     plea agreement, and I have the -- we did not get any updated

9     P.S.I., correct?  We have an old one from 20 --

10          MR. LAYMON:  That's correct, Your Honor.  We have the old

11     one.  I have not seen an updated one.

12          THE COURT:  Okay.  And are you aware of any comparable

13     cases?  Something's going in front of Judge Walton, but not right

14     away.

15          MR. LAYMON:  Yes, Your Honor.  There are other cases

16     involving AUC commanders, both in this district and in other

17     districts, yes.  I am aware of other cases.

18          THE COURT:  For drug cases?

19          MR. LAYMON:  Yes.  These are all drug trafficking cases.

20          THE COURT:  Right.  And you know the quantities?

21          MR. LAYMON:  I do, and -- yes.

22          THE COURT:  Can you provide that information to me?

23          MR. LAYMON:  Yes.  We do intend to provide that

24     information to you, Judge, in our filing.

25          THE COURT:  In your reply?

1          MR. LAYMON:  Yes.

2          THE COURT:  Well, okay, but then he'll want to respond.  I

3     don't know.

4          MR. LAYMON:  I can do it earlier than that.

5          THE COURT:  Yeah, I think so.  I wouldn't wait.  All

6     right.  Then I'll expect the defense counsel will give me the

7     transcript, all right.

8          MR. PEREZ:  Yes.

9          THE COURT:  You can just have it sent to -- no rush --

10    sent to chambers.

11         MR. PEREZ:  What I want to know is when they're going to

12    be submitting the sentences in similar cases so that I will be

13    able to reply to it.  For instance, the co-defendant in this case

14    was sentenced by this Court --

15         THE COURT:  -- sure --

16         MR. PEREZ:  -- and the sentence, I believe, was seven or

17    eight years, and that was a drug trafficker.  That was --

18         THE COURT:  I know.  So, you want to get it out before he

19    files?  It would be a lot easier if it's all ready to go,

20    otherwise he's going to respond.

21         MR. PEREZ:  I was going to file next Wednesday.

22         MR. LAYMON:  If you give me a week, Judge, we can get

23    that -- we can file it.

24         MR. PEREZ:  I would need it before Wednesday so I can deal

25    with that.

1      THE COURT:  I hope that we've moved on beyond -- I mean,

2 I've heard all the testimony.  Don't repeat it.  The government's

3 made its arguments, so....  how many defendants are there?  I

4 mean, you're going to come back and talk about the co-defendant.

5 I know about the co-defendant anyways.

6      What day again?  You want until the 25th?  Give it to him

7 on Monday, the 23rd, okay.

8      MR. LAYMON:  Monday, the 23rd?

9      THE COURT:  Yes.  So Monday, the 23rd, and then on the

10 25th, that will be the list of comparables, all right.

11      MR. PEREZ:  Fair enough.

12      MR. LAYMON:  We'll do our best, Your Honor.

13      THE COURT:  I know you'll do it.  And on the 25th he'll

14 file, and on the 30th he'll file, and we'll be back on the 1st.

15 Okay.  Thank you very much.

16      THE COURTROOM CLERK:  This honorable court is adjourned.

17      (Proceedings adjourned at 4:54 p.m.)

18

19

20              **C E R T I F I C A T E**

21              I, Scott L. Wallace, RDR-CRR, certify that
          the foregoing is a correct transcript from the record of
22        proceedings in the above-entitled matter.

23

          /s/ Scott L. Wallace                4/20/15
24        ---------------------------      ----------------
          **Scott L. Wallace, RDR, CRR**           **Date**
25           **Official Court Reporter**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

**I N D E X**

2

3

**EXAMINATIONS**                                                    Page

4   DIRECT EXAMINATION OF GIOVANNY ALVAREZ SANTOYO        5

5   CROSS-EXAMINATION OF GIOVANNY ALVAREZ SANTOYO        24

6   REDIRECT EXAMINATION OF GIOVANNY ALVAREZ SANTOYO     33

7   RECROSS-EXAMINATION OF GIOVANNY ALVAREZ SANTOYO      34

8   DIRECT EXAMINATION OF ANA FENNEY OSPINA              38

9                                                       10

10

**EXHIBITS**

11   **DESCRIPTION**                                                   Page

12   Government's Exhibit 4 admitted               10

13

14

15

16

17

18

19

20

21

22

23

24

25