UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,  :
                                   :
    v.                       :  Criminal No. 02-388
                                   :  (ESH)
SALVATORE MANCUSO-GOMEZ,  :  **(UNDER SEAL)**
    Defendant.           :

**FILED**
**OCT 1 4 2008**
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

STATEMENT OF FACTS IN SUPPORT OF
DEFENDANT'S PLEA OF GUILTY

If this case had proceeded to trial, the government would have been able to prove, beyond a reasonable doubt, the following statement of facts, which the parties now rely on in support of defendant's plea of guilty:

**_Autodefensas Unidas de Colombia and Defendants' Participation_**

1. In approximately 1997, the *Autodefensas Unidas de Colombia* ("AUC") began as a right-wing paramilitary group operating in Colombia. The stated objective of the AUC was to defeat the *Fuerzas Armadas Revolucionarias de Colombia* ("FARC") and *Ejército de Liberación Nacional* ("ELN") left-wing rebel paramilitary groups that controlled large portions of Colombia. The AUC primarily financed its military operations against the FARC and ELN and enriched its leaders by producing, selling, and distributing cocaine. The AUC was structured as a military organization with approximately 30,000 armed soldiers organized into blocks or regions with commanders for each area. Ultimately, the right-wing paramilitary group evolved into a narco-terrorist organization to further its political objectives.

2. On September 4, 2002 the commanders of the "former" AUC met for several days and the AUC was reformed Co-defendant Carlos Castano-Gil ("Castano"), defendant Salvatore Mancuso-Gomez ("Mancuso"), Ramon Isaza and Vincente Castano were installed as the leaders of the "new" AUC The organization was structured as follows:[1]



3 The conspiracy in this case involved the importation of cocaine into the United States by AUC leaders Castano and Mancuso and AUC member, co-defendant Juan Carlos Sierra-Ramirez ("Sierra-

---

[1] This organizational chart was obtained from the AUC web site on the internet

Ramirez") Castano was the leader and director of operations for the drug trafficking organization The AUC established cocaine prices and used the AUC military forces to protect cocaine laboratories, maintain cocaine base markets, mediate disputes between drug distributors, and protect drug trafficking operations.

4  The Defendant was a high ranking member of the organization and used his position in the AUC to manage the operations of the drug trafficking organization including production, distribution, and transportation operations. In addition, Mancuso was the leader of an AUC controlled area in Colombia called "Cordoba" From this designated region alone, cocaine was produced at a rate of approximately 2,000 kilograms per month over the course of the conspiracy for a total of 138,000 kilograms of cocaine This estimate is based upon information gathered from law enforcement and confidential sources, seizures of cocaine in the region and the location, inspection and destruction of cocaine laboratories in the Cordoba area The vast majority of the cocaine produced in the Cordoba area was transported to the coast area(s) of Colombia and ultimately smuggled into the United States.

5  Sierra-Ramirez was the organizer of large importation operations for AUC members which involved worldwide shipment of cocaine by aircraft, freighters and speed boats He directly coordinated two large shipments of cocaine that were seized by

law enforcement authorities.

6   More specifically, the evidence in this case would establish that cocaine base was sold and cocaine was produced in laboratories controlled and protected by the AUC troops under the direction and control of Castano and Mancuso  Cocaine sold or distributed by Mancuso was transported under the security of AUC troops to the coast of Colombia and loaded onto ships for transport to the United States and Europe  "Go-fast" boats -- small vessels rigged with extra motors and fuel -- were used to transport the cocaine from Colombia to trans-shipment points in Central America, Jamaica, Haiti, and the Dominican Republic for import to various regions along the boarder of the United States

7.   AUC operations was controlled and directed by Castano and enforcement of AUC rules on Colombian citizens was harsh  The evidence in this case would show that during July of 1998, Castano, with approximately 200 armed AUC troops, arrived at the town of San Pablo, Bolivar, Colombia where approximately 500 cocaine base buyers and sellers assembled  A speaker for the AUC announced that "counterfeit" cocaine would not be tolerated as AUC troops took 10 individuals from the crowd that the AUC suspected of selling "counterfeit" cocaine for execution  Castano himself addressed the crowd for an hour to set the cocaine base prices, the quality of cocaine base sold and the fees to be paid to the AUC for cocaine base production and transportation  In addition, Castano ordered that the production of cocaine

hydrochloride from the cocaine base was to be in conversion laboratories located in the local AUC area (i e , the Magdelena block) and the local AUC commander would purchase, in United States dollars, all of the cocaine hydrochloride produced at the AUC established price

### The 300 Kilogram Cocaine Importation into Mobile, Alabama

8.   In May 1998, Mobile, Alabama United States Custom Service ("Customs") Special Agent James Tanner ("S/A Tanner") had a confidential source ("CS") that was approached by Juan Forte in Miami, Florida  Forte was looking for transportation for a shipment of cocaine from Colombia to the United States and wanted to introduce the CS to a member of the AUC, Jose Danilo Triana The CS set up a meeting for July 1998 in Louisiana between S/A Tanner who was working in an undercover role and the targets Forte and Triana. Triana flew from Colombia to the U S  to attend the meeting  At the meeting S/A Tanner gave Forte and Triana a tour of a shrimp boat used for undercover operations and said that he would need $40,000[2] in advance for the transportation operation which was to involve the importation of 300 to 500 kilograms of cocaine

9   On October 21, 1998, S/A Tanner and the CS flew to New York and met with a representative of the AUC   There they received $39,500 for expenses to send the boat  In November 1998

---

[2] All money amounts are in United States dollars unless otherwise specifically noted

Customs sent an undercover supply vessel off the coast of Colombia to take delivery of the cocaine shipment  No one showed up to deliver the cocaine at sea, and the undercover supply vessel returned

10  S/A Tanner continued to negotiate with Triana who was in Colombia to resolve the issues in the shipment  On March 5, 1999, S/A Tanner flew to New York and met with a Colombian nicknamed "The Engineer"  "The Engineer" gave S/A Tanner $20,000 for expenses for the next trip  On March 27, 1999, S/A Tanner traveled again to New York and a Colombian woman named Luz Maria gave him an additional $29,000 for expenses

11  On April 8, 1999 the undercover supply vessel again left for the coast of Colombia to pick up the shipment of cocaine  Just after departure S/A Tanner received a call from the AUC targets who said to turn around because there were problems in Colombia  There were several more weather delays between that date and January 4, 2000

12. On January 4, 2000, Triana traveled from Colombia to Mobile, Alabama and met S/A Tanner  During the meeting they discussed the details of the transportation of the cocaine from the coast of Colombia to the United States and the codes and frequencies to be used  Triana wanted to know more about the highway escape routes that could be used after he received delivery of the shipment in the United States from the undercover vessel  Triana flew back to Colombia to obtain delivery of the

cocaine  On January 14, 2000, the undercover vessel left for the coast of Colombia to meet with the Colombian traffickers  After some rough weather the undercover vessel was in place on January 24th off the coast of Colombia  That day, Triana met with Castano in the AUC controlled area around the Sierra Nevada mountains while picking up the cocaine  On the morning of January 25, 2000 the Colombians delivered 300 kilograms of cocaine to the undercover vessel  The offload only took minutes but was preserved on videotape  The objective was then to deliver the cocaine to the targets in the United States and arrest them at the delivery point

13  On February 7, 2000, S/A Tanner met with Triana and Forte in the parking lot of the K-Mart in Mobile, Alabama  During this meeting, captured on audio tape, Triana said that the deal had to work because the cocaine was sold by Castano, the "Jefe of the Autodefensas", whom he met to while completing the drug deal  On February 8, 2000, part of the 300 kilograms of cocaine was delivered by undercover Customs agents to a waiting tractor-trailer truck in Mobile, Alabama and several individuals were arrested by Customs and DEA agents including Forte and Triana

### Cordoba's "Go-fast" Loads

14  The evidence would show that there were seven (7) cocaine loads of between 500 to 1,000 kilograms from the Cordoba area that Mancuso controlled  The cocaine was shipped under the protection of AUC soldiers to the coast of Colombia and loaded on

"go-fast" boats for transport to Central America, Jamaica, Haiti, and the Dominican Republic before shipment to various boarder regions of the United States   These shipments were as follows

- March 19, 1999  Defendant and Castano sold 1,000 kilograms of cocaine for transport to the United States.  The cocaine was transported to a beach in northern Colombia by AUC soldiers in trucks with hidden compartments   The Defendant himself carefully counted the number of kilograms, explaining that the "go-fast" vessels were to meet a merchant ship that could only store 1,000 kilograms in hidden compartments   The transporter was told he would only be paid for transportation costs and was not to transport any additional cocaine with this shipment

- August 4, 1999   500 kilograms of cocaine were received from the Defendant and Castano and were transported in the same manner to the United States as the previous 1,000 kilograms in March

- November 23, 1999   500 kilograms of cocaine were sold in the same fashion but while in transit to Jamaica the crew threw the cocaine overboard when they came in close contact with a United States Coast Guard vessel   The crew and ship were able to evade capture but the 500 kilograms of cocaine were lost   The United States Coast Guard recovered 350 kilograms of cocaine from the sea

- January 16, 2000   500 kilograms of cocaine were sold by the Defendant and successfully transported by "go-fast" vessel to Haiti in route to the United States

- March 4, 2000   500 kilograms of cocaine were sold by the Defendant and successfully transported by "go-fast" vessel to Haiti in route to the United States

- June 20, 2000: 600 kilograms of cocaine were received from the Defendant and successfully transported to the Dominican Republic in route to the United States

- September 12, 2000   814 kilograms of cocaine were sold by the Defendant and successfully transported by a "go-fast" vessel from Colombia to Jamaica to the Bahamas   While being

smuggled into the United States from the Bahamas, however, this load of cocaine was stolen   The Defendant personally contacted the two transporters and insistent upon a payment of one million United States dollars for the loss

### Admissions of Guilt/Criminal Acts

15   On live Colombian television Castano was interviewed by reporter Dario Arizmendi and the following is an excerpt from that interview

Arizmendi  What the guerrilla calls the gram tax?

Castano· Yes, so 1,000 kilograms of leaves are taken   They have to pay.  I don't know the amounts   That is managed by the Northern front   There isn't a cocaine laboratory, we aren't cocaine exporters.  I mean, we're not drug traffickers   But, to try and ignore that the Colombian conflict and the drug traffic feed each other would be a fallacy

Arizmendi  What percentage of the financing of the self-defense forces can come from ranchers and farmers that are dedicated to drug trafficking?

Castano  I'm saying    . I'm not saying that farmers and ranchers perpetuate drug trafficking   To me the drug trafficker is one and the farmer and the rancher is another   About the drug trafficking, the drug trafficking should finance 70 percent, like in the guerrilla some 90, more or less, between abduction and drug traffic.

16   In a television interview by RCN News on August 9, 2000, Castano was interviewed and noted

TV Interviewer. Would you be able to tell the country how much money, in concept, the AUC takes in through the chain of drug trafficking?

Castano: It's very difficult to manage but I will mention the figures Agabarra and San Lucas were 600 million worth of taxes charged to the coca growers  The finances that cover these two

fronts there have to cover the entire Northern Block of the AUC. This doesn't make me a drug trafficker By no means I set an interesting example for the country

17 The Defendant was interviewed on a program called La Noche airing on RCN Television News Colombia on August 4, 2003 During that program, the Defendant responded to a question concerning "taxation" of coca by noting that "we collect taxes from different regions of Colombia " During 2004, on a Public Broadcasting Service special called "Wide Angel," the Defendant admitted that the AUC receives 70% of its money from taxing drug traffickers

18 In December 2002, the Defendant began his participation in what was to be the Justice and Peace[3] process, a program designed to have AUC members voluntarily surrender their arms and truthfully disclose their criminal activity During this process, the Defendant has admitted to involvement in the murders of "military targets," mayors, drug traffickers and peasants Included in this admission is the February 2000 AUC massacre of forty-two (42) people in the El Salado neighborhood of the Las Ovejas Bolivar region of Colombia Evidence discovered by the Colombian government suggests that the Defendant's estimate may have been mistaken The actual number of individuals actually killed and tortured by AUC members may be as many as one hundred (100) civilians

---

[3] Law 975-05 Justicia y Paz

19. In addition to this admission, the evidence will show AUC paramilitary troops committed 15 massacres killing a total of 145 individuals during May 29 through September 1, 1999 in the area of Vetas, Norte de Santander and in and around La Gabarra and Tibu. In addition, AUC paramilitary troops committed a massacre of 27 people in Chengue, Sucre region on January 17, 2001. As Castano admitted on RCN News show La Noche on August 9, 2000, in response to a question regarding the AUC being listed as a terrorist organization by the United States, "there have been excesses" and asked forgiveness for the "deplorable events that have occurred that anyone in his right mind would never be able to remotely order".

Wayne Raabe
Acting Chief
Narcotics and Dangerous Drug Section
Criminal Division
United States Department of Justice

By: _____          10/14/08
     Robert A. Spelke                  Date
     Trial Attorney
     Narcotics and Dangerous Drug Section
     U.S. Department of Justice

## DEFENDANT'S ACCEPTANCE

I have read the forgoing eleven (11) pages of the Statement of Facts and have discussed it with my attorney, Joaquin Perez, Esquire. I fully understand this document and agree without reservation that the facts are accurate and correct. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this factual proffer fully.

I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in the signed plea agreement. I am satisfied with the legal services provided by my attorney in connection with this plea agreement and matters related to it.

Date: 10/14/08

_____
Salvatore Mancuso-Gomez
Defendant

Date: 10/14/08

_____
Joaquin Perez, Esquire
Attorney for Salvatore Mancuso-Gomez